[No. B183477. Second Dist., Div. Four. May 30, 2006.]

THE GORHAM COMPANY, INC., Cross-complainant and Appellant, v. FIRST FINANCIAL INSURANCE COMPANY, Cross-defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I B.

1534

## COUNSEL

Lawrence R. Greenberg for Cross-complainant and Appellant.

Berman, Berman & Berman and Spencer A. Schneider for Cross-defendant and Respondent.

## OPINION

**WILLHITE, J.**—When an insured who has financed the purchase of an insurance policy through a lender defaults, and the lender notifies the insurer under Insurance Code section 673, subdivision (d), that it is exercising the insured's right to cancel the policy, must the insurer notify additional named insureds of the cancellation? In these circumstances, we hold that neither section 673 nor section 677.2 requires the insurer to provide notice of cancellation to an additional named insured.[1]

### PROCEDURAL AND FACTUAL BACKGROUND

Cross-complainant The Gorham Company, Inc. (Gorham), appeals from the summary judgment granted in favor of cross-defendant First Financial Insurance Company (First Financial) on Gorham's first amended cross-complaint. Gorham also challenges the denial of its own motion for summary adjudication. The issues in this appeal arise from Gorham's contention that First Financial, the insurer of one of Gorham's subcontractors on a construction project for which Gorham was the general contractor, had a duty to defend Gorham when it was sued for construction defects allegedly caused by the subcontractor's negligent work. We affirm the judgment.

A. *The Project*

In January 1997, Gorham contracted with the City of Los Angeles Harbor Department (the City) to be the general contractor for the construction of a publicly owned community center. Gorham's wood framing subcontractor on the project was Reza Ebrahimi doing business as PDC Associates (PDC). PDC was insured by First Financial, which issued a commercial lines policy to PDC for the policy period September 5, 1997 to September 5, 1998 (the PDC policy). The additional-insured endorsement of the PDC policy made Gorham an "insured" for any liability arising out of PDC's work for

---

[1] All undesignated section references are to the Insurance Code.

Gorham.[2] PDC financed the policy premium through a lender, Arizona Premium Finance Co., Inc. (APFC). As part of the financing agreement, PDC assigned its right to cancel the policy to APFC in the event PDC did not pay its premium. On November 25, 1997, on instructions from APFC, First Financial cancelled the policy for nonpayment of the premium. Gorham did not receive notice of the cancellation.

PDC continued to work on the project until July 8, 1998, when Gorham terminated PDC. PDC had not finished its work. In November 1998, Gorham terminated its contract with the City, and left the project. The City then replaced Gorham with another general contractor, who finished construction.

B. *The Underlying Litigation*

Complex litigation involving the City, Gorham and PDC ensued.[3] The various actions ultimately were deemed related and assigned to a single judge. As here relevant, in March 1999, Gorham sued the City for various claims, contending that the City's plans were defective. The City then filed a cross-complaint against Gorham alleging, among other things, that Gorham breached its contract, and that its negligent work caused many defects in construction. Gorham then filed a cross-complaint of its own against its subcontractors, including PDC, alleging that the construction defects identified by the City were caused by the subcontractor's negligence.

To fund its defense to the City's cross-complaint, Gorham tendered its defense not only to its own liability carriers, but also to its subcontractors' carriers, including First Financial, relying on its status as an additional insured under the subcontractors' policies. Gorham's liability carriers, and the carriers for several subcontractors, accepted Gorham's defense. First Financial, however, was not among them. First Financial denied the tender on various grounds, including that no property damage covered by the PDC policy had occurred while the policy was active.

Ultimately, with the exception of Gorham's cross-complaint against PDC, the underlying litigation settled. Included among the settled claims was the City's cross-complaint against Gorham.

---

[2] The endorsement provided in relevant part: "WHO IS AN INSURED (Section II) is amended to include [Gorham], but only with respect to liability arising out of 'your work' for that insured or for you."

The policy defined "your work" as "a. Work or operations performed by you or on your behalf; and [¶] b. Materials, parts or equipment furnished in connection with such work or operations. [¶] 'Your work' includes: [¶] a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work'; and [¶] b. The providing of or failure to provide warnings or instructions."

[3] Other parties were involved, but are irrelevant to the issues raised by this appeal.

## C. *The Instant Case*

First Financial commenced the instant case by filing a complaint for declaratory relief against PDC and Gorham. First Financial was funding PDC's defense to Gorham's still pending cross-complaint in the underlying litigation. First Financial's declaratory relief complaint in the instant case sought a declaration that First Financial had no duty to defend and indemnify PDC against Gorham's claims. In a ruling not involved in this appeal, the trial court granted summary judgment for First Financial on its declaratory relief complaint.

However, before that ruling, Gorham filed a cross-complaint in the instant action against First Financial, seeking damages for First Financial's failure to participate in funding Gorham's defense to the City's cross-complaint in the underlying litigation. Gorham's operative pleading is its first amended cross-complaint, and it is that pleading which is in issue on this appeal.

Gorham's first amended cross-complaint alleges that Gorham was an additional insured under PDC's policy, and that First Financial had a duty to defend Gorham against the City's claims. Gorham alleges causes of action for breach of contract (on first-party and third-party-beneficiary theories), breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, and declaratory relief.

## D. *First Financial's Motion for Summary Judgment*

First Financial moved for summary judgment on Gorham's first amended cross-complaint. Its motion raised two grounds: (1) under the terms of the PDC policy, there was no potential for coverage for damages sought by the City's cross-complaint in the underlying litigation; and (2) because other insurers defended and indemnified Gorham in the underlying litigation, Gorham suffered no damage from First Financial's failure to participate in the defense.

## E. *Gorham's Motion for Summary Adjudication*

Gorham moved for summary adjudication on its first amended cross-complaint. However, its notice of motion failed to identify the issues on which summary adjudication was sought. Its memorandum of points and authorities identified two issues: (1) whether First Financial's cancellation of the PDC insurance policy was effective as to Gorham; and (2) whether damage done by PDC invoked coverage under the PDC policy.

### F. *The Trial Court's Ruling*

The trial court granted First Financial's motion for summary judgment. It concluded that under the language of the PDC policy, First Financial had no duty to defend Gorham against the City's cross-complaint.[4] The court therefore did not discuss the second issue raised by First Financial's motion—whether Gorham suffered any damage.

The court denied Gorham's motion for summary adjudication because the notice of motion failed to state the issues sought to be adjudicated. In the alternative, the court ruled that the issue of whether the PDC policy was cancelled was not a proper issue for summary adjudication. Further, the court observed that the issue of whether First Financial had a duty to defend Gorham was resolved by the ruling on First Financial's motion for summary judgment.

On appeal, Gorham challenges both the grant of summary judgment, and the denial of summary adjudication.

## DISCUSSION

### I. First Financial's Summary Judgment Motion

As noted, the trial court granted First Financial's motion for summary judgment on Gorham's first amended cross-complaint. All of Gorham's causes of action depend on the existence of a duty by First Financial to defend Gorham against the City's cross-complaint in the underlying litigation. Because Gorham is an additional named insured under the PDC policy, First Financial's duty to defend under that policy extends to Gorham if any of the City's claims sought damages possibly covered by the PDC policy. (See *Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 29, 34 [76 Cal.Rptr.2d 113].)

Gorham contends, in substance, that the City's cross-complaint in the underlying litigation alleged claims that invoked the "property damage" coverage of the PDC policy. Therefore, according to Gorham, First Financial had a duty to defend Gorham against the City's claims, and the trial court erred in granting summary judgment.

---

[4] The court's ruling on this issue was consistent with its earlier ruling granting First Financial's motion for summary judgment on First Financial's declaratory relief complaint against PDC and Gorham. (See fn. 2, *ante.*) In the earlier ruling, the court concluded that First Financial had no duty to defend PDC against Gorham's claims in the underlying litigation.

The evidence necessary to determine the existence of such a duty—the language of the policy, and the circumstances under which the policy was canceled—are undisputed.[5] We review the grant of summary judgment de novo to determine whether there is a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493].) We conclude that there is no possibility of coverage under the PDC policy. The policy period ended on November 25, 1997, when the policy was cancelled. Any damage caused by PDC's work within the scope of the City's cross-complaint in the underlying litigation occurred after that date, and was the result of PDC's ongoing operations. Therefore, the damage was not covered by the PDC policy, and the trial court properly granted summary judgment.

## A. *Cancellation of the Policy Under Section 673*

The "Insuring Agreement" section of the PDC policy obligates First Financial to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." It also obligates First Financial "to defend the insured against any 'suit' seeking those damages." Subject to various exclusions, the policy defines "property damage" to include "[p]hysical injury to tangible property, including all resulting loss of use of that property." To be covered, such "property damage" must "occur[] during the policy period."

Setting aside for the moment the precise boundaries of "property damage" within the meaning of the policy, we first decide whether the policy was effectively canceled on November 25, 1997, thereby ending the policy period. We conclude that it was.

The undisputed evidence shows that PDC financed the purchase of its policy by entering a "premium finance agreement" (Fin. Code, § 18564) with APFC, an "industrial loan company" (Fin. Code, former § 18003).[6] As part of its premium finance agreement with APFC, PDC assigned its right to cancel

---

[5] Gorham challenges certain rulings sustaining some of First Financial's objections to Gorham's evidence. None of these rulings deal with evidence material to the issues on which we resolve this appeal.

[6] Financial Code section 18564 defines "premium finance agreement" to mean "a loan contract, note, agreement or obligation by which an insured agrees to pay to a company in installments the principal amount advanced by the company to an insurer or producer in payment of premium on an insurance contract or contracts, plus charges, with the assignment as security therefor of the unearned premiums, accrued dividends or loss payments, the final installment due date of the agreement not to extend beyond the term of the insurance contract included in the agreement having the latest expiration date."

Finance Code former section 18003 defined "industrial loan company" to mean in relevant part "any corporation which in the regular course of business loans money and issues its own

the policy to APFC in the event PDC did not pay its premium under the agreement.[7] The PDC insurance policy gave PDC, as "[t]he first Named Insured shown in the Declarations," the right to cancel the policy "by mailing or delivering to [First Financial] advance written notice of cancellation."

Upon PDC's failure to make a required installment payment, APFC sent notice of cancellation to First Financial, instructing First Financial to cancel the policy effective November 25, 1997. The notice stated that APFC was canceling the policy for nonpayment of the premium. As instructed, First Financial canceled the policy effective November 25, 1997. Neither APFC nor First Financial sent notice of cancellation to Gorham.

Gorham contends that because it received no notice of the cancellation, policy coverage for Gorham as an additional named insured did not terminate. Section 673, however, provides otherwise. Section 673 governs cancellation of an insurance policy by a lender for nonpayment of the premium. We set forth the provisions relevant to this case in the margin, and discuss them individually as necessary to resolve the issues in this appeal.[8]

---

choses in action under the provisions of this division [7]." Division 7 of the Financial Code (§ 18000 et seq.) governs, among other things, insurance premium financing agreements (Fin. Code, § 18560 et seq.).

[7] The premium finance agreement stated in relevant part that PDC "irrevocably appoint[ed] APFC its attorney-in-fact with full authority to cancel the [PDC policy] for nonpayment."

[8] When the lender is an industrial loan company, section 673 provides in relevant part:

"(a) As used in this section, 'exercise the right to cancel' means the act of formally electing to use the right of the insured to cancel any insurance policy in accordance with and subject to the provisions of that policy when the right to use that right of the insured has been transferred or assigned by the insured in writing executed by, or on behalf of, the insured to a lender who has advanced to the insurer the premium for the policy. The transfer or assignment may be by power of attorney or other document. The transfer or assignment may, but need not, be accompanied by an assignment of any unearned premium due the insured on cancellation.

"(b) No lender shall exercise the right to cancel a financed insurance policy because of the default of the insured under a premium payment loan agreement except in accordance with this section. [¶] . . . [¶]

"(d) An industrial loan company shall, in giving the insured 10 days' notice of its intent to cancel pursuant to Section 18608 of the Financial Code, furnish a copy of such notice to the insurance agent or insurance broker indicated on the premium finance agreement. After expiration of the 10-day period, the industrial loan company may thereafter, in the name of the insured, cancel the insurance contract or contracts by mailing to the insurer a written notice of cancellation, and the insurance contract shall be cancelled as if the notice of cancellation had been submitted by the insured person, but without requiring the return of the insurance contract or contracts. The industrial loan company shall also mail a notice of cancellation, setting forth the effective date of cancellation of the finance insurance contract, to the insured at his or her last known address and to the insurance agent or insurance broker indicated on the premium finance agreement. For purposes of this subdivision, the words 'premium finance agreement' shall have the same meaning as that specified in Section 18564 of the Financial Code. [¶] . . . [¶]

"(i) A lender which sends a written exercise of cancellation right or a written notice of cancellation to an insurer, as provided in . . . subdivision (d) in the case of an industrial loan

■ Subdivision (b) of section 673 states: "No lender shall exercise the right to cancel a financed insurance policy because of the default of the insured under a premium payment loan agreement except in accordance with this section." In relevant part, the term "exercise the right to cancel" is defined by subdivision (a) of section 673 as "the act of formally electing to use the right of the insured to cancel any insurance policy in accordance with and subject to the provisions of that policy," when the right has been assigned in writing to the lender.

When the lender is an industrial loan company (Fin. Code, § 18003), the relevant procedure for cancellation is provided by section 673, subdivision (d). The procedure of subdivision (d) involves three steps, none of which requires the lender or insurer to give notice of cancellation to additional named insureds such as Gorham.

■ First, subdivision (d) provides that the "industrial loan company shall, *in giving the insured 10 days' notice of its intent to cancel pursuant to Section 18608 of the Financial Code,* furnish a copy of such notice to the insurance agent or insurance broker indicated on the premium finance agreement." (§ 673, subd. (d), italics added.) Financial Code section 18608 requires the lender to "mail to the insured, to his last known address or to the address shown on the premium finance agreement at least 10 days prior to cancellation, a notice of its intent to cancel the insurance contract or contracts." The "insured" entitled to such notice is "the person who has purchased or arranged to purchase an insurance contract and who enters into a premium finance agreement with a premium finance agency." (Fin. Code, § 18562.) The term "insured" does not encompass an additional named insured such as Gorham. Therefore, the notice required by the first step of section 673, subdivision (d), does not include additional insureds.

Second, "[a]fter expiration of the 10-day period, the industrial loan company may thereafter, in the name of the insured, cancel the insurance contract or contracts by mailing to the insurer a written notice of cancellation, and the insurance contract shall be cancelled as if the notice of cancellation had been submitted by the insured person, but without requiring the return of the insurance contract or contracts." (§ 673, subd. (d).) Thus, the lender's notice of cancellation, sent to the insurer, effects a cancellation of the policy in the same manner as if the insured had exercised the right to cancel.

company, thereby represents that he or she has a valid right so to do and to receive the unearned premium. If the lender thereby accomplishes the cancellation and receives an unearned premium, such representation shall be conclusive as between the insurer and the lender. An insurer relying upon written exercise of that right containing a confirmation of cancellation date . . . shall be relieved from complying with any other duty or form of cancellation required by this code."

Third, "[t]he industrial loan company shall also mail a notice of cancellation, setting forth the effective date of cancellation of the finance insurance contract, to *the insured* at his or her last known address and to the insurance agent or insurance broker indicated on the premium finance agreement." (§ 673, subd. (d), italics added.) As we have noted, "the insured" within the meaning of subdivision (d) is the person who purchased the policy through the premium finance agreement. The term "insured" does not include additional named insureds.

■ Thus, section 673, subdivision (d) does not require the lender to provide notice of cancellation to an additional named insured. Nor does it impose that duty on the insurer. Indeed, with limited exceptions listed in subdivision (f) (discussed below), the insurer is *relieved* of any duty of notification. Section 673, subdivision (i) provides in relevant part: "An insurer relying upon written exercise of that right [i. e., the lender's exercise of the insured's right to cancel the policy] containing a confirmation of cancellation date . . . *shall be relieved from complying with any other duty or form of cancellation required by this code.*" (Italics added.) Therefore, when the insurer terminates the policy after receiving the industrial loan company's notice that it is exercising the insured's right to cancel, the insurer has no further duty of notification to effect cancellation.

Gorham contends that it was entitled to notice from First Financial under subdivision (f) of section 673. Subdivision (f) states a limited exception requiring the insurer to notify governmental agencies, mortgagees, or other third parties when required by statute, regulation, or contract. Subdivision (f) provides: "*All statutory, regulatory, and contractual restrictions providing that the financed insurance policy may not be canceled unless notice is given to a governmental agency, mortgagee, or other third party shall apply where cancellation is effected under this section.* The insurer shall give the prescribed notice on behalf of itself or the insured to any governmental agency, mortgagee, or other third party on or before the fifth business day after the day it receives . . . a written notice of cancellation from an industrial loan company, pursuant to subdivision (d), and shall, for purpose of the notice, determine the effective date of cancellation as to those persons mentioned in this subdivision only, taking into consideration the number of days' notice required to complete the cancellation." (Italics added.)

Gorham asserts that it is a "third party" entitled to notice under subdivision (f). Yet Gorham points to no regulatory or contractual restrictions providing that the financed policy may not be cancelled unless Gorham receives notice. Gorham suggests that there is a statutory restriction that requires notice from the insurer—section 677.2.

■ Section 677.2 "applies only to cancellations pursuant to Section 676.2." (§ 677.2, subd. (d).)[9] For purposes of section 677.2 (and 676.2 as well), the term " '[c]ancellation' means termination of coverage by an insurer (*other than termination at the request of the insured*) during a policy period." (§ 660, italics added.)[10] When such a cancellation by the insurer occurs for nonpayment of the premium, section 677.2 requires that the insurer provide 10 days' written notice to "the named insured." (§ 677.2, subd. (b).) In *Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116, 1121 [100 Cal.Rptr.2d 246], the court construed the term "named insured" to include additional insureds named in the policy.

■ Contrary to Gorham's contention, section 677.2 is inapplicable to cancellation of the PDC policy under section 673. As noted, section 677.2 applies only to termination of the policy other than at the insured's request. Termination of the policy under 673, however, is treated the same as termination at the request of the insured: the lender formally elects to use the insured's right to cancel the policy (§ 673, subd. (a)); the lender gives notice of cancellation to the insurer "in the name of the insured" (§ 673, subd. (d)); and the insurer cancels the insurance "as if the notice of cancellation had been submitted by the insured person" (§ 673, subd. (d)). Because the cancellation is treated as if made at the request of the insured, and because the insurer is "relieved from complying with any other duty or form of cancellation required by" the Insurance Code (§ 673, subd. (i)), section 677.2 is not a "statutory . . . restriction[] providing that the financed insurance policy may not be canceled unless notice is given to [a] third party" (§ 673, subd. (f)).

■ Gorham argues that interpreting section 673 so as to permit cancellation of the policy without notice from the insurer to additional named insureds would be absurd, and would defeat the purpose of the statute. According to Gorham, additional named insureds must be given the opportunity to reinstate the policy in order to protect themselves, and to protect persons who might suffer bodily injury or property damage. Although courts may disregard literal interpretation of a statute to avoid absurd results (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333,

---

[9] Insurance Code section 677.2 provides in relevant part: "(b) A notice of cancellation shall be in writing and shall be delivered or mailed . . . to the named insured at the mailing address shown on the policy. . . . [¶] The notice of cancellation shall include the effective date of the cancellation and the reasons for the cancellation. [¶] (c) The notice of cancellation shall be given at least 30 days prior to the effective date of the cancellation, except that in the case of cancellation for nonpayment of premiums . . . the notice shall be given no less than 10 days prior to the effective date of the cancellation. . . . [¶] (d) This section applies only to cancellations pursuant to Section 676.2."

[10] Section 660 lists various definitions for terms used in chapter 10 of the Insurance Code, of which section 677.2 and section 676.2 are parts.

340 [33 Cal.Rptr.2d 109, 878 P.2d 1321]), they should do so rarely, and only in "extreme cases"—those in which, as a matter of law, the Legislature did not intend the statute to have its literal effect. (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1698, 1700 [8 Cal.Rptr.2d 614] (*Unzueta*).) Gorham's case does not qualify.

The legislative history of section 673 shows that the statute was intended to require premium financers to provide the insured who financed the policy with advance notice of intent to exercise the insured's right to cancel the insurance, and to provide confirming notice of actual cancellation. The notice requirements were designed to permit the insured to obtain replacement insurance, and to notify any third-party claimants as to whether the insurance was in effect. (See Enrolled Bill Rep., Assem. Bill No. 1850 July 21, 1970; Sen. Finance Com. Rep. on Assem. Bill No. 1850 (1970 Reg. Sess.).) Where longer notice periods might be required by law or contract for third parties such as mortgage lenders or governmental agencies, subdivision (f) of section 673 was designed to delay cancellation of the policy as to those parties until the longer notice was completed.

Nothing in the legislative history suggests that the Legislature intended section 673 to require insurers to provide notice of cancellation to persons named in additional-insured endorsements, absent some independent contractual or legal requirement for such notice. Therefore, we do not disregard the literal for an embellished reading of the statute that would require notice to additional named insureds. (*Unzueta, supra,* 6 Cal.App.4th at pp. 1698, 1700.) Such a reading would not be statutory interpretation, but statutory revision with no basis in the statutory language or legislative history.

■ We conclude that Gorham was not entitled to notice of APFC's intent to cancel the policy. First Financial's termination of the policy on November 25, 1997, based on APFC's notice, was effective, and the policy period ended on that date. To be covered by the PDC policy, any property damage caused by PDC's work must have occurred before the cancellation date.

B. *Property Damage Coverage*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II. Gorham's Motion for Summary Adjudication

Because the trial court properly granted summary judgment for First Financial, we need not discuss Gorham's challenges to the ruling denying its motion for summary adjudication.

---

\*See footnote, *ante*, page 1532.

## DISPOSITION

The judgment is affirmed. First Financial shall recover its costs on appeal.

Epstein, P. J., and Hastings, J.,[*] concurred.

[*]Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.