[No. H029406. Sixth Dist. Jan. 4, 2008.]

DEPARTMENT OF THE CALIFORNIA HIGHWAY PATROL, Petitioner, v.
THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent;
RICHARD J. QUIGLEY, Real Party in Interest.

COUNSEL

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, James M. Humes, Chief Assistant Attorney General, Jacob A. Appelsmith, Assistant Attorney General, Miguel A. Neri, Fiel D. Tigno and Karen Kiyo Huster, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Lascher & Lascher and Wendy Cole Lascher for Real Party in Interest.

OPINION

**RUSHING, P. J.—**

STATEMENT OF THE CASE

Real party in interest Richard J. Quigley (Quigley) was given five citations by officers of the California Highway Patrol (CHP) for violating Vehicle Code section 27803, subdivision (b), which requires motorcycle drivers and their passengers to wear safety helmets.[1] At a hearing on nine such violations, including the five CHP citations, the court ruled that the five CHP violations were correctable, that is, ones for which correction citations or "fix-it" tickets

---

[1] All further statutory references are to the Vehicle Code unless otherwise specified.

could be issued. At a sentencing hearing on January 24, 2005, the court reiterated its ruling and gave Quigley several weeks to correct the violations. It directed him to bring a helmet to the CHP, at which time the CHP would sign off on the citations. On May 20, 2005, the court issued a formal, written order, directing the CHP to sign off on certificates of correction for all five CHP infractions if and when Quigley presented to the CHP a helmet "bearing a certification of compliance (the symbol 'DOT')."[2] Thereafter, the court issued an order directing the CHP to show cause why it should not be held in contempt for refusing to comply with its order. At a hearing on July 15, 2005, the court postponed ruling on whether to hold the CHP in contempt in order to give the CHP an opportunity to challenge the order of May 20, 2005.

The CHP now seeks a petition for a writ of mandate and/or prohibition, challenging the order. The CHP claims that Quigley's violations were not correctable, and therefore, the court erred in ordering it to sign off on the five citations.[3]

We agree that the court erred and issue a writ of mandate, directing the court to vacate its order.

## MOOTNESS

On our own motion, we have taken judicial notice of an order filed on August 16, 2006, in which the superior court dismissed all five CHP citations on the ground that the "helmet law statutes are void for vagueness, or otherwise unworkable, as applied . . . ." (See Evid. Code, § 452, subd. (a).) However, dismissal of the underlying citations does not render the CHP's petition moot. Even though the CHP need not comply with the order to sign off on the citations, the CHP is still subject to contempt proceedings and a possible sanction for failing to obey the order before the citations were dismissed.

We also note that Mr. Quigley died on September 15, 2007. For the same reason that dismissal does not render the petition moot, Mr. Quigley's death does not do so either.

---

[2] DOT is an acronym for the Department of Transportation.

[3] On November 10, 2005, this court issued an order staying the May 20, 2005, order and related contempt proceedings.

CORRECTABILITY OF QUIGLEY'S HELMET LAW VIOLATIONS

The CHP claims that as a matter of law, a violation of section 27803, subdivision (b) (hereafter section 27803(b)) is not a correctable Vehicle Code infraction.

Section 27803 provides, in relevant part, "(a) A driver and any passenger shall wear a safety helmet meeting requirements established pursuant to Section 27802 when riding on a motorcycle, motor-driven cycle, or motorized bicycle. [¶] (b) It is unlawful to operate a motorcycle, motor-driven cycle, or motorized bicycle if the driver or any passenger is not wearing a safety helmet as required by subdivision (a). [¶] . . . [¶] (e) For the purposes of this section, 'wear a safety helmet' or 'wearing a safety helmet' means having a safety helmet meeting the requirements of Section 27802 on the person's head that is fastened with the helmet straps and that is of a size that fits the wearing person's head securely without excessive lateral or vertical movement. [¶] . . . [¶] (g) In enacting this section, it is the intent of the Legislature to ensure that all persons are provided with an additional safety benefit while operating or riding a motorcycle, motor-driven cycle, or motorized bicycle."[4]

Sections 40610 and 40303.5 list the types of Vehicle Code violations that potentially qualify as correctable offenses and specify the circumstances under which a "fix-it" ticket may be issued.

---

[4] Section 27802 provides, "(a) [t]he department may adopt reasonable regulations establishing specifications and standards for safety helmets offered for sale, or sold, for use by drivers and passengers of motorcycles and motorized bicycles as it determines are necessary for the safety of those drivers and passengers. The regulations shall include, but are not limited to, the requirements imposed by Federal Motor Vehicle Safety Standard No. 218 (49 C.F.R. Sec. 571.218) and may include compliance with that federal standard by incorporation of its requirements by reference. Each helmet sold or offered for sale for use by drivers and passengers of motorcycles and motorized bicycles shall be conspicuously labeled in accordance with the federal standard which shall constitute the manufacturer's certification that the helmet conforms to the applicable federal motor vehicle safety standards. [¶] (b) No person shall sell, or offer for sale, for use by a driver or passenger of a motorcycle or motorized bicycle any safety helmet which is not of a type meeting requirements established by the department."

"Department" as used in section 27802 refers to the Department of the California Highway Patrol. (§§ 290, 24000.)

The federal regulation referred to in section 27802—49 Code of Federal Regulations part 571.218 (2006)—sets forth the "minimum performance requirements" for the design, manufacture and distribution of "helmets designed for use by motorcyclists and other motor vehicle users," for the purpose of "reduc[ing] deaths and injuries . . . resulting from head impacts." (49 C.F.R. § 571.218, S1, S2.) Among other things, it defines words and phrases used and lays down requirements of impact attenuation, penetration, retention, configuration, testing and labeling.

For purposes of convenience, we shall refer to sections 27802 and 27803, including the federal regulation, as the "Helmet Law."

Section 40610 provides, in relevant part, "(a)(1) . . . [I]f, after an arrest, accident investigation, or other law enforcement action, it appears that a violation has occurred involving a registration, license, all-terrain vehicle safety certificate, or mechanical requirement of this code, and none of the disqualifying conditions set forth in subdivision (b) exist and the investigating officer decides to take enforcement action, the officer shall prepare, in triplicate, and the violator shall sign, a written notice containing the violator's promise to correct the alleged violation and to deliver proof of correction of the violation to the issuing agency. . . . [¶] . . . [¶] (b) Pursuant to subdivision (a), a notice to correct violation shall be issued as provided in this section or a notice to appear shall be issued . . . , unless the officer finds any of the following: [¶] (1) Evidence of fraud or persistent neglect. [¶] (2) The violation presents an immediate safety hazard. [¶] (3) The violator does not agree to, or cannot, promptly correct the violation."

Section 40303.5 provides, in relevant part, "Whenever any person is arrested for any of the following offenses, the arresting officer shall permit the arrested person to execute a notice containing a promise to correct the violation in accordance with the provisions of Section 40610 unless the arresting officer finds that any of the disqualifying conditions specified in subdivision (b) of Section 40610 exist. . . . [¶] . . . [¶] (d) *Any infraction involving equipment set forth in Division 12 (commencing with Section 24000)*, Division 13 (commencing with Section 29000), Division 14.8 (commencing with Section 34500), Division 16 (commencing with Section 36000), Division 16.5 (commencing with Section 38000), and Division 16.7 (commencing with Section 39000)."[5] (Italics added.)

The CHP claims a Helmet Law violation is not correctable under section 40610, subdivision (a)(1) because that subdivision applies *only* to violations that involve registration, licenses, all-terrain vehicle safety certificates, or mechanical requirements of the Vehicle Code. Thus, it does not apply to Helmet Law violations. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 13 [241 Cal.Rptr. 67, 743 P.2d 1323] [the expression of certain things in a statute necessarily involves exclusion of other things not expressed].)

The CHP acknowledges, however, that section 40610 is not the only statute that makes Vehicle Code infractions correctable. As noted, section 40303.5 authorizes "fix-it" tickets for "[a]ny infraction involving equipment set forth

---

[5] The statute also makes offenses involving registration, driver's licenses, and bicycle equipment correctable. (§ 40303.5, subds. (a), (b) & (c).)

in Division 12 (commencing with Section 24000) . . . ." (§ 40303.5, subd. (d).) Although a violation of the Helmet Law is an infraction (see § 40000.1) and part of division 12, the CHP argues that section 40303.5 cannot reasonably be construed to apply to all equipment violations, especially to Helmet Law violations, because such an interpretation "flies in the face of common sense" and "would yield an absurd result."[6]

■   Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. (*In re Harris* (1993) 5 Cal.4th 813, 844 [21 Cal.Rptr.2d 373, 855 P.2d 391].) We begin by examining the statutory language, giving the words their usual and ordinary meaning. If we find no ambiguity, we presume that the Legislature meant what it said, and the plain meaning of the language governs. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) If, on the other hand, the statutory language is unclear or ambiguous and permits more than one reasonable interpretation, we may consider various extrinsic aids to help us ascertain the Legislature's intent, including legislative history, public policy, settled rules of statutory construction, and an examination of the evils to be remedied and the legislative scheme encompassing the statute in question. (*Ibid.*; *People v. Garrett* (2001) 92 Cal.App.4th 1417, 1422 [112 Cal.Rptr.2d 643].) In such circumstances, we select the interpretation that comports most closely with the apparent intent of the Legislature, with a view toward promoting, rather than defeating, the general purpose of the statute and avoiding an interpretation that would lead to absurd consequences. (*People v. Walker* (2002) 29 Cal.4th 577, 581 [128 Cal.Rptr.2d 75, 59 P.3d 150].)

■   Section 40303.5 makes correctable "[a]ny infraction involving equipment" set forth in divisions 12, 13, 14.8, 16, 16.5, and 16.7 of the Vehicle Code. We presume that when the Legislature enacted section 40303.5, it was aware of the statutes in each of these divisions and the wide variety of equipment they regulate. (See *People v. Harrison* (1989) 48 Cal.3d 321, 329

---

[6] The CHP implicitly concedes that a motorcycle helmet is "equipment" and that a failure to comply with section 27803(b) is an "infraction involving equipment." (§ 40303.5, subd. (d).) We agree.

Neither section 40303.5 nor any other section of the Vehicle Code defines the word "equipment." Ordinarily, the word means a thing—e.g., a tool, an implement, an apparatus, a piece of gear, a device—that performs, enables, or enhances the performance of some function or activity. (See Webster's 3d New Internat. Dict. (1993) p. 768; *Mobilease Corp. v. County of Orange* (1974) 42 Cal.App.3d 461, 467 [116 Cal.Rptr. 864] [equipment ordinarily means the implements used in an operation or activity].) Clearly helmets are safety equipment like seatbelts and are designed and intended to protect motorcycle drivers and passengers from suffering injuries in the event of an accident.

[256 Cal.Rptr. 401, 768 P.2d 1078]; *Bailey v. Superior Court* (1977) 19 Cal.3d 970, 977, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394].) Indeed, the inclusion of certain divisions and the exclusion of others—e.g., divisions 14.1 (transporting explosives), 14.3 (transporting inhalation hazards), 14.5 (transporting radioactive materials), 14.7 (transporting flammable liquids), 14.9 (motor vehicle damage control), and 15 (size, weight, and load)—indicates not only an awareness of the various statutes but also a purposeful and selective approach in deciding which infractions should be potentially correctable.

We further observe that the ordinary meaning of the word "any" is clear, and its use in a statute unambiguously reflects a legislative intent for that statute to have a broad application. (*Souza v. Lauppe* (1997) 59 Cal.App.4th 865, 873 [69 Cal.Rptr.2d 494]; see *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1191 [114 Cal.Rptr.2d 459, 36 P.3d 2] [use of the word " 'any' " serves to "broaden the applicability" of a provision].) Thus, the phrase "any infraction" indicates that the Legislature did not intend to restrict the type of equipment infractions in the enumerated divisions that could be potentially correctable; rather, that phrase means exactly what it says: Any—and thus every—equipment infraction in the enumerated divisions is potentially correctable—i.e., the subject of a "fix-it" ticket. (Cf., e.g., *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934] [statutory phrase " 'any* unpublished information' " referred to all unpublished information, "without limit and no matter what kind"]; *Regents of University of California v. East Bay Municipal Utility Dist.* (2005) 130 Cal.App.4th 1361, 1373 [31 Cal.Rptr.3d 278] [statutory phrase " 'any* nondiscriminatory charge' " covered all types of nondiscriminatory charges without limitation]; *Souza v. Lauppe, supra,* 59 Cal.App.4th at p. 873 [statutory phrase " 'any changed condition' " not ambiguous or susceptible of more than one reasonable interpretation].)

■ Despite the plain meaning of the statute and its lack of ambiguity, the CHP invokes a recognized exception to the plain meaning rule: The literal meaning of unambiguous statutory language "may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole." (*Silver v. Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689]; see *People v. Anzalone* (1999) 19 Cal.4th 1074, 1079 [81 Cal.Rptr.2d 315, 969 P.2d 160].)

The CHP does not propose a less literal, reasonable alternative interpretation of the statute. Instead, the CHP argues by example, providing three possible applications of the literal language that, according to the CHP, would lead to absurd results. The CHP notes that (1) section 27400 prohibits driving while wearing headsets or earplugs on both ears; (2) section 28150 prohibits

the use of radar jamming devices; and (3) section 28100 requires the driver of a pilot car to display at least one red warning flag on each side of the vehicle. The CHP argues that if violations of these statutes were correctable offenses, a violator could simply go to a CHP office, show that he or she is no longer wearing a headset or earplugs, using a radar jamming device, or driving without red flags, and the CHP would have to sign off on the citation. The CHP argues that such results are "absurd" because they "would effectively strip the CHP of its ability to meaningfully enforce these laws." However, the CHP's examples fail to convince us that the Legislature did not intend the statutory language to be applied in accordance with its plain meaning.

■ First, we observe that the Vehicle Code divisions listed in section 40303.5 regulate an extremely wide variety of things, including not only equipment but also fees, certificates, licenses, and identification.[7] We cannot conceive of a reasonable, but less literal, alternative interpretation of the statutory language that would clearly identify those types of equipment violations that are potentially correctable and distinguish them from the types of violations that are not. Moreover, the CHP's avoid-absurd-results approach would subject the statute to piecemeal interpretation by courts on an equipment-by-equipment basis. We doubt that the Legislature, knowing the different types of equipment regulated by the numerous statutes, would have used the simple and inclusive phrase "any infraction involving equipment" in the enumerated divisions if it intended to restrict the statute to only certain types of equipment infractions. We find it even more doubtful that the Legislature would have used such broad language but intended for courts to later narrow its scope to cover some but not all equipment infractions in the enumerated divisions.

---

[7] Division 12 regulates lighting, brakes, windshields, mirrors, horns, sirens, exhaust devices, safety belts, inflatable restraints, children's seats, headsets, earplugs, tires, fenders, televisions, motorcycles, signs, refrigeration, odometers, fire extinguishers, bumpers, signals, and theft alarms. The statutes concerning motorcycles (§§ 27800–27803) regulate seats, handlebars, footrests, and safety helmets.

Division 13 regulates towing, towing devices, and the loading, securing, and transportation of logs, poles, lumber, lumber products, baled hay, hazardous materials, workmen, farm labor vehicles, trailers, metal, metal products, baled cotton, boxes, tank containers, and waste tires.

Division 14.8 regulates the safe operation of motortrucks, truck tractors, a variety of school buses, tour buses, trailers and semitrailers, dollies, manufactured homes, park trailers, and commercial motor vehicles over a certain size, grape gondolas, and wheelchair lifts.

Division 16 regulates agricultural implements, including lift carriers, tip-bed trailers, hay loaders, swathers, spray or fertilizer applicator rigs, row dusters, wagons, and lighting equipment.

Division 16.5 regulates off-highway vehicles, including motor-driven cycles, snowmobiles, sand or dune buggies, all-terrain vehicles, and jeeps; lighting equipment, mufflers and exhaust systems, spark arresters, emission control devices, and helmets.

Division 16.7 regulates bicycles.

Next, we note that the statute provides a procedure that helps avoid the absurd consequences and potential enforcement difficulties feared by the CHP. Although section 40303.5, subdivision (d) may render any equipment infraction in enumerated divisions potentially correctable, that does not mean that a violator is automatically entitled to a "fix-it" ticket. Under the statute, when an officer stops someone and decides to take further action, the officer may decline to issue a "fix-it" ticket if he or she finds (1) there is evidence of fraud or persistent neglect, (2) the infraction presents an immediate safety hazard, or (3) the violator refuses to promptly correct the violation or cannot promptly do so. (§§ 40303.5, 40610, subd. (b)(1)–(3).)

Thus, for example, if an officer stops a pilot car driver for not displaying red flags, and the officer decides that under the circumstances further enforcement action is appropriate—e.g., because the driver does not have red flags or the driver has red flags but refuses to display them—the officer can find that the infraction presents an immediate safety hazard and issue a regular citation. This would be the case with similar infractions involving headsets, earplugs, and radar jamming devices.[8] This would also be the case where an officer stops a motorcyclist for not wearing any headgear because the failure to do so would clearly pose "an immediate safety hazard."[9]

---

[8] It is arguable that a radar jamming device should not be deemed "equipment" within the meaning of section 40303.5. First, not every item regulated in the statutes that make up the enumerated divisions can be considered equipment. As noted, the statutes also regulate things like fees, certificates, licenses, and identification. (See, e.g., § 27150.8 [muffler certification]; § 36000 [farm equipment licenses]; §§ 38010–38225 [off-highway vehicle identification, fees, plates, title].)

Second, in general, the fundamental purpose of the regulations is to promote the proper and safe maintenance, performance, and operation of vehicles and the safety of all drivers and passengers. The vast majority of items regulated are things that are specifically designed to achieve that purpose—e.g., bumpers, lights, seatbelts, tires, etc. A radar jammer cannot reasonably be considered a safety device or equipment designed to promote the proper and safe performance and operation of a vehicle. Rather, using a radar jammer is simply prohibited conduct, not unlike having open containers of alcohol or concealed weapons in a vehicle.

[9] Quigley asserts that wearing a protective helmet may prevent injuries but only when there is an accident caused by something else. He argues that because the failure to wear a helmet is not itself injurious and cannot by itself cause an accident, such a failure can never constitute, an "*immediate* safety hazard." (§ 40610, subd. (b)(2), italics added.)

We agree that certain types of equipment problems—e.g., inoperable headlights and defective brakes—present immediate safety hazards because they can directly cause an accident. However, we reject Quigley's view that the statutory phrase "immediate safety hazard" refers only to those equipment violations that alone can cause injury or an accident.

Whenever one drives a motor vehicle on the roadway, he or she faces an ever-present, and often unforeseen, risk of injury from a variety of causes, including one's own operation of the vehicle; mechanical problems; another driver or vehicle; pedestrians and bicyclists; and weather, lighting, and road conditions. Moreover, it is beyond dispute that because motorcyclists and their passengers are more exposed and unprotected than persons riding in an enclosed vehicle, they are much more vulnerable to and likely to sustain injuries, especially head injuries, in an accident. Given such increased vulnerability and the constant risk of an

(§ 40610, subd. (b)(2).) On the other hand, where a motorcyclist's helmet had a broken chinstrap, an officer could find no immediate safety hazard and issue a "fix-it" ticket.

Clearly, law enforcement officers bear the primary responsibility for enforcing equipment regulations. The statutory procedure reflects a legislative intent to give them the authority and duty to evaluate the circumstances surrounding an equipment violation and make the initial determination concerning whether a potentially correctable infraction should be treated as such. (Cf. §§ 40303, 40304 [giving arresting officer discretion to issue citation or take violator into custody].) Certainly, the Legislature could have specifically listed the infractions within the enumerated divisions that qualify as potentially correctable offenses. Instead, however, it elected to use the all-inclusive statutory phrase "any infraction involving equipment" and give officers in the field the authority to make the initial determination concerning whether an equipment violation is correctable. In doing so, the Legislature indicated its preference for a flexible, fact-based, case-by-case approach to the enforcement of equipment regulations and the issuance of "fix-it" tickets instead of a rigid classification of correctable and noncorrectable infractions. Given this preference, we decline to begin judicially legislating such a classification system.

It is settled that courts should disregard unambiguous language "only in 'extreme cases'—those in which, as a matter of law, the Legislature did not intend the statute to have its literal effect." (*Gorham Co, Inc. v. First Financial Ins. Co.* (2006) 139 Cal.App.4th 1532, 1544 [44 Cal.Rptr.3d 197], quoting *Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1700 [8 Cal.Rptr.2d 614].)

Here, giving full effect to the unambiguous statutory phrase "any infraction" will not hamper the enforcement of equipment regulations or otherwise result in absurd consequences inconsistent with the manifest purpose of the statute. If the CHP believes that it could better enforce equipment

accident, we consider it unreasonable to suggest that wearing no protective headgear does not pose an immediate danger to the safety of a motorcycle driver or passenger. Indeed, since the purpose of requiring helmets is to enhance safety by protecting against head injuries, the Helmet Law itself implies a legislative finding that driving or riding *without* a helmet poses an immediate safety hazard. (See *Buhl v. Hannigan* (1993) 16 Cal.App.4th 1612, 1627–1628 [20 Cal.Rptr.2d 740] [noting that Helmet Laws reflect "a nationwide concern, obviously shared by the Legislature of the State of California, for the safety and welfare of motorcyclists and their passengers"].) For this reason, we reject Quigley's narrow view of the phrase "immediate safety hazard" in section 40610, subdivision (b)(2). Such a view would frustrate the purpose of the Helmet Law. (See *Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218] [statutes construed with reference to entire scheme of law and harmonized so as to retain their effectiveness and promote rather than defeat legislative purpose].)

regulations with a more rigid, specific classification of potentially correctable infractions or that a Helmet Law violation should not be a potentially correctable infraction, then it should seek appropriate statutory changes from the Legislature.

The CHP contends that even if a violation of section 27803(b) is potentially correctable, the court erred in making Quigley's violations correctable. According to the CHP, the evidence established disqualifying circumstances as set forth in section 40610, subdivision (b). In particular, the CHP argues that Quigley's numerous citations reveal a pattern of "persistent neglect" (§ 40610, subd. (b)(1)); "[t]he continued riding of a motorcycle without a helmet poses an obvious immediate safety hazard . . ." (see § 40610, subd. (b)(2)); and Quigley's testimony before the trial court "has demonstrated that he does not agree to, or cannot, promptly correct the violations" (see § 40610, subd. (b)(3)).[10] Given this evidence, the CHP implicitly claims that the court could not reasonably rule that Quigley's infractions were correctable.

■ As noted, under section 40303.5, the arresting officer makes the initial decision concerning whether to issue a "fix-it" ticket or, upon finding a disqualifying circumstance, a regular ticket. The statute does not require a written finding concerning disqualifying circumstances if an officer issues a regular ticket. Generally, in the absence of evidence to the contrary, we presume that "official duty has been regularly performed" (Evid. Code, § 664), and this presumption applies to law enforcement officers, except on the issue of the lawfulness of a warrantless arrest. (*Davenport v. Department of Motor Vehicles* (1992) 6 Cal.App.4th 133, 141 [7 Cal.Rptr.2d 818]; see *People v. Farrara* (1956) 46 Cal.2d 265, 269 [294 P.2d 21].) Thus, a court may infer from the type of citation issued that the officer did or did not find disqualifying circumstances. (Cf. *People v. Dunlap* (1993) 18 Cal.App.4th 1468, 1477 [23 Cal.Rptr.2d 204] [proper to infer that court made necessary foundational findings].)

Here, Quigley received five regular citations, suggesting that the CHP officers found at least one disqualifying circumstance that rendered Quigley's particular violations noncorrectable.[11]

---

[10] In its reply to Quigley's preliminary opposition to the petition, the CHP submitted an excerpt from Quigley's Web site, which the CHP argues further establishes the disqualifying circumstances of fraud or persistent neglect and of a refusal or inability to promptly correct the citation. It does not appear that any of this material was before the trial court when it ruled on correctability. Accordingly, we shall disregard it in determining the propriety of the trial court's ruling.

[11] Quigley argues that in addition to the disqualifying circumstances in section 40610, subdivision (b), each officer could have issued a citation based on a blanket policy of refusing

Although the record does not disclose all of the circumstances surrounding each violation, the CHP asserts that the five violations were based on the fact that Quigley was riding his motorcycle wearing a soft cloth hat, such as a baseball cap or a knit hat. The record supports the CHP's assertion.

At a hearing on November 19, 2004, concerning nine Helmet Law citations, including the five CHP citations, the evidence revealed that Quigley had been cited eight times for wearing something that bore a DOT certificate of compliance but which was made of soft fabric; and one time for wearing nothing on his head. At the hearing, the court, citing *Bianco v. California Highway Patrol* (1994) 24 Cal.App.4th 1113 [29 Cal.Rptr.2d 711] (*Bianco*), stated that a DOT symbol established a rebuttable presumption that Quigley's headwear complied with the Helmet Law. However, the court invoked common sense and found that a helmet must have a hard shell or surface to protect against impacts and penetration and thereby meet the federal safety standard, which requires that a helmet pass impact and penetration tests. Accordingly, the court ruled that "there is, as indicated, a rebuttable presumption, and that, Mr. Quigley, you're now on notice that that presumption has been rebutted by reasonable common definitions, and that the statute requires more than *a soft covering for your head and more than a Dixie cup with a string and a DOT sticker.*" (Italics added.) As to eight citations, including the five CHP citations, the court stated, "[W]hat I'm finding is that, in relation to the statute, that your helmet does not comply and that you are now on notice that [neither] that helmet, *nor any other soft item as a covering*, complies, but I will find, then, that it is at this point, in relation to <u>Bianco</u>[, *supra*, 24 Cal.App.4th 1113] and in relation to that rebuttable presumption, that they are then, the remainders, as fix-it tickets. [¶] In that the presumption has now been rebutted, you are on notice, and you now have to comply with [sections] 27802 and 27803 in a manner other than wearing *a soft covering.*" (Italics added.)

In response to the court's ruling, the Santa Cruz County District Attorney filed a motion to reconsider. It asserted that the People had provided reliable evidence that on nine occasions Quigley violated the Hemet Law by riding without any headgear "or wearing a baseball cap" or "wearing a knit watch cap." "The baseball cap has been described as being a 'typical baseball cap,' constructed of a soft fabric with a fixed front bill which extends approximately 4 inches, having no inner padding, having no chinstraps or other type of ties which would fasten under the chin, and having a label or embroidered letters DOT on the back of the hat, but not having the other required labeling information." The district attorney asserted that at the end of the hearing, "Judge Barton ruled that the baseball cap worn by the Defendant did not

to make any motorcycle helmet ticket correctable. However, the record before us does not establish the existence of such a blanket policy or that it was applied to Quigley.

comply with [sections] 27802 and 27803(b) and put Defendant on notice of his hat's 'non compliance.' " The district attorney argued, among other things, that on its face, wearing a soft hat posed an immediate safety hazard, and therefore, the violations were not correctable.

At a hearing on January 24, 2005, Quigley did not dispute the district attorney's factual assertion concerning the physical characteristics of Quigley's headwear. Nor does Quigley dispute those factual assertions in this proceeding or otherwise suggest that the CHP citations were not based on his wearing a soft head covering as described in the motion and referred to by the court at the previous hearing in November 2004.[12]

We agree with the trial court's finding that Quigley's hat did not comply with the Helmet Law.

In *Buhl v. Hannigan, supra*, 16 Cal.App.4th 1612 (*Buhl*), a motorcyclist challenged the Helmet Law as unconstitutionally vague because it incorporated a federal safety standard that the average person could not understand, making it impossible for citizens or police officers to determine whether a particular helmet complied. (16 Cal.App.4th at p. 1621.) The court agreed that because the federal safety standard is so technical, the average person generally cannot be expected know whether a particular motorcycle helmet satisfies the standard. However, the court rejected the challenge because the Helmet Law did not require that a consumer or law enforcement officer be able to decide whether a helmet was properly fabricated. It only required that one wear a motorcycle safety helmet that bore a certificate of compliance affixed by the manufacturer. (16 Cal.App.4th at pp. 1621–1622.)

The court also rejected a claim that the Helmet Law was too general because it requires a motorcyclist to wear a helmet which fits the head "without excessive lateral or vertical movement." (§ 27803, subd. (e).) In rejecting this challenge, the court explained that "day-to-day experience teaches a purchaser or wearer of apparel to discern the fit—tight or loose, big or small. And we have little doubt observers can detect misfits to some degree. Thus, it matters not that someone may, at some time, guess wrong about the size of the helmet: ' "The law is replete with instances in which a person must, at his [or her] peril, govern his [or her] conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' '*substantial*,' and the like. Indeed, a wide spectrum of human activities is regulated by such terms. . . . Yet standards of this kind are not impermissively

---

[12] In a deposition taken on May 9, 2007, Quigley admitted that the headwear in all of the underlying CHP citations was made of cotton cloth and lacked a chinstrap. Although he said it "[l]ooks like a trucker's cap," he preferred that it be called "headgear" rather than a "cap."

[*sic*] vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind." ' [Citation.]" (*Buhl, supra,* 16 Cal.App.4th at p. 1623.)

■ We agree with the *Buhl* court's observation that in general, a motorcyclist cannot be expected to know whether a particular hard-shell helmet was properly fabricated or complies with the technical specifications in the federal standard. However, even with only a cursory reading of the federal safety standard, a rational person would know that a soft cloth hat would not comply. That standard provides, in pertinent part, that "[t]he purpose of this standard is to reduce deaths and injuries to motorcyclists and other motor vehicle users resulting from head impacts." (49 C.F.R. § 571.218, S2.) Moreover, to meet the technical specification for impact resistance, a helmet must pass a test that involves putting the helmet on a dummy headform and dropping it from several feet onto an anvil. (49 C.F.R. § 571.218, S5, S5.1, S5.7, S7.)

One does not need to understand the technical details of the test to know for certain that by itself, a soft cloth hat would fail any such test because a cloth hat cannot provide a significant measure of head protection from direct impact on a surface as hard as an anvil. As the court below appropriately observed, common sense—or as the *Buhl* court characterized it, day-to-day experience—teaches that to provide head protection against hitting the pavement or a curb, a helmet must necessarily be made of something hard enough to withstand a significant amount of the force of impact.

Thus, we conclude that given the plain meaning and common understanding of the word "helmet"[13] and its use in a law designed to protect against head injuries, a rational person could not reasonably believe that Quigley's hat possibly complied with the Helmet Law. This is especially so in light of the type of helmets that one commonly sees worn by motorcycle law enforcement officers, motorcyclists, and even bicyclists, all of which generally have a hard outer shell. Rather, in our view, one need not understand the technical requirements of an impact resistance test or be able to determine whether a particular hard-shell helmet could pass it to know that the Helmet Law would necessarily exclude the use of a soft cloth hat as a safety helmet.

[13] In addition to defining "helmet" as a piece of medieval armor, Webster's Third New International Dictionary, *supra,* at page 1052 defines it as "any of various protective head coverings usu. made of a *hard* material (as metal, heavy leather, fiber) to resist impact and supported by bands that prevent direct contact with the head for comfort and ventilation; *specif.* one covering the top, back, and sides of the head and often the neck and having a window for the face and sometimes breathing or radio apparatus (as for a diver)." (Italics added.)

We now turn to the court's ruling that Quigley's CHP citations were correctable. Citing *Bianco, supra*, 24 Cal.App.4th 1113, the court found that the DOT symbol on Quigley's hat gave rise to a rebuttable presumption that it complied with the Helmet Law. As noted, the court, applying common sense, reasoned that a helmet must have a hard shell to provide any protection from a head impact. Thus, the court found that the soft nature of Quigley's hat rebutted the presumption of compliance. Relying on *Bianco* for the proposition that a motorcyclist must have actual notice that his or her helmet does not comply, the court ruled that the CHP citations were correctable because Quigley did not receive actual notice of noncompliance until the court expressly advised him.

We conclude that the court's analysis and determination of correctability were erroneous as a matter of law. The court initially erred in finding that the DOT symbol raised a rebuttable presumption that Quigley's hat complied with the Helmet Law. The court's reliance on *Bianco, supra*, 24 Cal.App.4th 1113 was misplaced.

In *Bianco*, a motorcyclist was cited for wearing a beanie-type helmet, manufactured by a company that made fiberglass motorcycle helmets. The manufacturer had affixed DOT self-certification stickers to the beanie-type helmets. However, when questions were raised about compliance with the Helmet Law, the helmets were tested, and they failed five of six major areas of performance testing, including minimum impact absorption requirements, penetration resistance requirements, and retention requirements. As a result, the CHP determined that the helmets did not comply with the Helmet Law, and the manufacturer recalled them. (*Bianco, supra*, 24 Cal.App.4th at pp. 1117–1120.)

Citing *Buhl, supra*, 16 Cal.App.4th 1612, 1622, the motorcyclist claimed that he did not violate the law because, in *Buhl*, the court held that the Helmet Law required only that he wear a helmet with a DOT certification, which he had done. (*Bianco, supra*, 24 Cal.App.4th at p. 1123.) The court in *Bianco* acknowledged the holding in *Buhl* but held that a manufacturer's DOT sticker creates only a rebuttable presumption that a helmet complies with the Helmet Law, which, in that case, was rebutted by the lab testing and helmet recall. Concerning DOT certification, the court explained, "The federal statutory scheme contemplates an honor system in which manufacturers comply with detailed federal performance standards for motor vehicle equipment through self-certification. If a manufacturer determines that its helmet conforms to the federal standards and certifies that conformity by labeling the helmet with a DOT self-certification sticker, it is legal to sell that helmet under the federal law and it is legal under California law to drive a motorcycle while wearing that helmet until such time as that helmet has been

shown not to conform to the federal standards. Once a helmet is shown not to conform to the federal standards—as was the case with [the beanie-type helmet]—the presumption of compliance created by the self-certification label is rebutted." (*Bianco*, at p. 1123.)

We determine the scope of *Bianco*'s holding by looking at the facts and the issues raised in that case. (See *Western Landscape Construction v. Bank of America* (1997) 58 Cal.App.4th 57, 61 [67 Cal.Rptr.2d 868].) *Bianco* involved the self-certification of a fiberglass helmet by a motorcycle helmet manufacturer and held that a DOT certification on that helmet raised a rebuttable presumption of compliance with the Helmet Law. *Bianco* does not suggest, however, that a DOT certification symbol affixed by anyone to any type of headwear, including a cloth hat, gives rise to a rebuttable presumption of compliance. Such a broad reading of *Bianco* goes well beyond its facts and is unreasonable on its face because, for example, it would mean that a DOT symbol affixed to a yarmulke, do-rag, or New Year party hat renders each presumptively compliant with the federal safety standards and the Helmet Law. However, such a notion is absurd. The facts here are not materially different.

In contrast to the helmet at issue in *Bianco*, this case involves a soft hat. Moreover, the record here does not reveal who affixed the DOT symbol to Quigley's hat or when it was affixed.[14] In any event, given the soft nature of the hat, the trial court could not reasonably find that it had been manufactured and intended for use as a motorcycle safety helmet or that the manufacturer affixed a DOT symbol to it as part of a bona fide self-certification process to indicate to potential customers that the hat had passed performance tests and complied with the federal safety standard. Furthermore, as discussed above, a requirement that a helmet pass a hard-impact resistance test necessarily implies that the helmet must be sturdy enough to withstand a substantial amount of direct blunt force. Quigley's soft cloth hat could not pass any such requirement. Thus, the anomalous presence of a DOT symbol on Quigley's hat could not reasonably suggest that the hat complied with the Helmet Law.

Accordingly, we conclude that the trial court could not reasonably consider the DOT symbol on Quigley's hat as a legitimate and valid self-certification of the hat as a motorcycle helmet and then, applying *Bianco,* find that the DOT symbol gave rise to a rebuttable presumption of compliance. In doing so, the court gave *Bianco* an overly literal and unreasonably broad application.

In addition to finding a rebuttable presumption, the court also erred in basing its determination of correctability on Quigley's alleged lack of notice

---

[14] In his deposition, Quigley stated that he received the hat in the mail, and it already had the DOT symbol embroidered on it.

that his hat did not comply with the Helmet Law. Again, the court relied on *Bianco*, where the court concluded, "[T]he statement in *Buhl* that consumer compliance with the state law only requires the consumer to wear a helmet bearing the DOT self-certification sticker does not apply when a helmet has been shown not to conform with federal standards *and* the consumer has actual knowledge of this fact." (*Bianco, supra*, 24 Cal.App.4th at p. 1123, original italics.)

Initially, we doubt that Quigley needed express notice from a court to know that a cloth hat would not comply with the Helmet Law. We presume that Quigley was aware of the law and its purpose of protecting against head injuries. Thus, as discussed above, a rational person would know that a soft hat could not provide protection against head impacts or pass any test for impact resistance. Thus, the very nature of Quigley's hat provided sufficient notice that his hat did not comply with the Helmet Law, regardless of whether Quigley understood the specific technical requirements of the federal standard. As noted, it does not take an understanding of the federal standard to know that the Helmet Law would necessarily exclude the use of a soft cloth hat as a safety helmet.

In any event, even if we indulge in the assumption that Quigley did not know that his hat was noncompliant until the trial court told him so, the court nevertheless erred in basing the correctability of the CHP citations on Quigley's alleged lack of notice.

■ Notice is an aspect of the constitutional right to due process, which "requires that a criminal defendant be given fair notice of the charges to provide an opportunity to prepare a defense and to avoid unfair surprise at trial." (*People v. Tardy* (2003) 112 Cal.App.4th 783, 786 [6 Cal.Rptr.3d 24].) Notice is also important in determining whether a penal statute is constitutional because "[a] law is void for vagueness only if it 'fails to provide adequate notice to those who must observe its strictures' and ' "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' [Citation.]" (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332 [96 Cal.Rptr.2d 735, 1 P.3d 52].)

Correctability, on the other hand, is derived from statutes and not from the Constitution. In essence, correctability is a form of leniency by which one may avoid a fine and have a citation and prosecution dismissed despite the technical violation of an equipment statute. Whether an infraction is correctable depends exclusively on (1) whether a violation is among those listed in sections 40610 and 40303.5; and if so, (2) whether the infraction involves fraud or persistent neglect, whether it presents an immediate safety hazard, or

whether the violator does not agree or cannot promptly correct the violation. (§ 40610, subd. (b).) Notice is not relevant in determining whether a particular infraction is correctable.

In short, the record affirmatively shows that the trial court relied on an erroneous legal theory in ruling that Quigley's violations were correctable. Moreover, the record does not reflect that the parties discussed or the court considered evidence concerning the circumstances that are relevant in determining correctability. Therefore, we do not infer that the court made implicit findings that Quigley's infractions did not involve fraud, persistent neglect, or an immediate safety hazard; or that he did not or could not agree to correct the Helmet Law violations. Indeed, the court paid no attention to the fact that the CHP officers implicitly found at least one circumstance that rendered the infractions noncorrectable.

Despite the court's error, " '[n]o rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10]; see *People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

■ Thus, notwithstanding the court's erroneous reasoning, we could as a matter of law uphold its finding of correctability if the record established that the CHP infractions did not involve any of the disqualifying circumstances. However, the record does not do so. On the contrary, the fact that Quigley was repeatedly cited by the CHP for wearing only a soft hat would amply support a finding that his infractions presented an immediate safety hazard, if not also persistent neglect. Indeed, as a practical matter, it is obvious that a motorcyclist wearing a soft hat is no more protected against head injuries if he or she slams into the pavement, a curb, or another vehicle than a person wearing nothing on his or her head. For this reason, it is reasonable to suspect that the CHP officers issued regular citations to Quigley because his infractions posed the type of immediate safety hazard that the Helmet Law was designed to mitigate, if not eliminate.

Returning to the fundamental issue underlying the CHP's petition, we conclude that the trial court erred in making the five CHP violations correctable. Because that ruling was erroneous, we agree with the CHP that the court further erred in ordering it to sign off on the citations for those violations. Accordingly, the CHP is entitled to the relief it seeks.

## DISPOSITION

The petition for a writ of mandate or prohibition is granted. The superior court is directed to vacate its order of May 20, 2005.[15] Our order of November 10, 2005, staying the trial court's May 20, 2005, order and the related contempt proceedings is hereby vacated.[16] Each party to bear its own costs. (See Cal. Rules of Court, rule 8.490(m)(2).)

Premo, J., and Duffy, J., concurred.

A petition for a rehearing was denied January 31, 2008, and the petition of real party in interest for review by the Supreme Court was denied March 19, 2008, S160869.

---

[15] The court need not conduct further proceedings or enter a new order on correctability because whether the CHP citations are correctable became moot when the court dismissed the citation for other reasons. As noted, we have addressed the merits of the petition only because the CHP faced contempt proceedings for failing to obey the court's order of May 20, 2005. As a result of our decision, the contempt proceedings shall abate.

[16] Quigley's request for an award of attorney fees under Code of Civil Procedure section 1021.5 is denied. Although this case may have involved an issue of statewide importance, we do not find "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ." (Code Civ. Proc., § 1021.5.)