RUSHING, P.J., Dissenting
I. Introduction
My esteemed colleagues join a number of courts in refusing to apply Penal Code section 1170.18, subdivision (c)(§-1170.18(c)), according to its plain meaning. To the best of my knowledge, only one of those decisions is currently citable. (People v. Esparza (2015) 242 Cal.App.4th 726, 734-737, 195 Cal.Rptr.3d 597; see Cal. Rules of Court, rules 8.1115(a), 8.1105(e)(1).) Although I joined in that decision, I have concluded on further reflection that I erred in doing so, as I believe my colleagues continue to err here. All of these cases should be governed by the fundamental principle that statutes possessing a plain meaning must be given effect in accordance with that meaning. None of the recognized exceptions to this rule is present. Least of all can the language at issue here be credibly said to involve a "drafting error." The real rationale for refusing to enforce the statute according to its terms is that the effect of the statute's plain meaning was not pointed out in the ballot pamphlet to the voters who adopted it. I have concluded that for a court to disregard plain statutory language on such a ground is obnoxious to the constitutional separation of powers. I have also concluded that, carefully read, the statute contains ample intrinsic evidence that it is intended to accomplish exactly the result my colleagues attribute to a drafting error. In addition, it is apparent that opponents of the measure were aware of this effect and that, while they apparently chose not to refer to it in their argument in the ballot pamphlet, they did urge it in the surrounding public debate as a ground to reject the measure. For those reasons, I would apply the statute as written and would reverse the judgment here so that the trial court can reassess the issues under the legal standard mandated by section 1170.18(c).
*1197 II. The Plain Meaning Rule
In construing a statute adopted by initiative we are bound by the same principles as those governing our construction of statutes enacted by the Legislature. (People v. Lopez (2005) 34 Cal.4th 1002, 1006, 22 Cal.Rptr.3d 869, 103 P.3d 270; People v. Elliot (2005) 37 Cal.4th 453, 478, 35 Cal.Rptr.3d 759, 122 P.3d 968; Robert L. v. Superior Court (2003) 30 Cal.4th 894, 900, 135 Cal.Rptr.2d 30, 69 P.3d 951.) The first and most basic of these principles, often acknowledged by this court, is that " 'if statutory language is "clear and unambiguous there is no need for construction, and courts should not indulge in it." ' " (Cryolife, Inc. v. Superior Court (2003) 110 Cal.App.4th 1145, 1154, 2 Cal.Rptr.3d 396, quoting Tiernan v. Trustees of Cal. State University & Colleges (1982) 33 Cal.3d 211, 218, 188 Cal.Rptr. 115, 655 P.2d 317[same]; accord, Gilbert v. City of Sunnyvale (2005) 130 Cal.App.4th 1264, 1285, 31 Cal.Rptr.3d 297; Coniglio v. Department of Motor Vehicles (1995) 39 Cal.App.4th 666, 674, 46 Cal.Rptr.2d 123, quoting *435 People v. Overstreet (1986) 42 Cal.3d 891, 895, 231 Cal.Rptr. 213, 726 P.2d 1288; see Robert B. v. Susan B. (2003) 109 Cal.App.4th 1109, 1113, 135 Cal.Rptr.2d 785[where language "is clear, we will not engage in statutory construction to determine [its] intended purpose and scope"].)
III. The Ambiguous Language Exception
There are of course some well-recognized exceptions to the plain meaning rule. Foremost among them is that where statutory language is ambiguous, courts may consult various constructional aids to determine its intended meaning. (Murphy v. Kenneth Cole Productions, Inc. (2007) 40 Cal.4th 1094, 1103, 56 Cal.Rptr.3d 880, 155 P.3d 284.) This is not a true exception to the plain meaning rule, but a limitation implicit in the rule itself: if statutory language is ambiguous, it has no plain meaning and a court has no choice but to go beyond the language in hopes of ascertaining its intended meaning and effect. This limitation cannot come into operation, however, unless the language at issue is "susceptible of more than one reasonable interpretation." (Ibid .) "If there is no ambiguity in the language of the statute, then the plain meaning of the language governs." (Cypress Semiconductor Corp. v. Superior Court (2008) 163 Cal.App.4th 575, 581, 77 Cal.Rptr.3d 685; see Bonnell v. Medical Bd. of California (2003) 31 Cal.4th 1255, 1261, 8 Cal.Rptr.3d 532, 82 P.3d 740.)
The majority does not suggest that there is anything ambiguous about the language here under examination. Section 1170.18(c)declares that the definition of dangerousness set forth there applies "throughout this Code." This can only refer to the Penal Code. (See Marshall v. Pasadena Unified School Dist. (2004) 119 Cal.App.4th 1241, 1255, 15 Cal.Rptr.3d 344[finding "nothing ambiguous about the phrase 'as used in this code' " to define " 'emergency' "
*1198 as used in Public Contract Code]; People v. Bucchierre (1943) 57 Cal.App.2d 153, 166, 134 P.2d 505["The words 'as in this code provided' ... refer to the Penal Code."].) Here this means that section 1170.18(c)'s definition of " 'unreasonable risk of danger to public safety' " applies to that phrase as it appears in Penal Code section 1170.126, subdivision (f)(§ 1170.126(f)), and thus to the question whether, as the trial court found, resentencing defendant would pose "an unreasonable risk of danger to public safety." Since the phrase "throughout this Code," as thus used, is not "susceptible of more than one reasonable interpretation" (Murphy v. Kenneth Cole Productions, Inc.,supra, 40 Cal.4th at p. 1103, 56 Cal.Rptr.3d 880, 155 P.3d 284), "there is no need for construction and [we] should not indulge in it" (Cryolife, Inc. v. Superior Court,supra, 110 Cal.App.4th at p. 1154, 2 Cal.Rptr.3d 396).
IV. The Absurd Consequences Exception
A narrower exception to the plain meaning rule permits courts to depart from the meaning of statutory language, even if it is unambiguous, when its literal application would produce " ' " 'absurd consequences.' " ' " (May v. City of Milpitas (2013) 217 Cal.App.4th 1307, 1333, 159 Cal.Rptr.3d 310; Younger v. Superior Court (1978) 21 Cal.3d 102, 113, 145 Cal.Rptr. 674, 577 P.2d 1014; see California Highway Patrol v. Superior Court (2008) 158 Cal.App.4th 726, 736, 70 Cal.Rptr.3d 280["The literal meaning of unambiguous statutory language 'may be disregarded to avoid absurd results' "].) The underlying rationale is that the Legislature cannot have intended to bring about absurd consequences, so if the statute has that effect, it must be an incorrect expression of legislative intent. (See *436 Sterling Park, L.P. v. City of Palo Alto (2013) 57 Cal.4th 1193, 1203, 163 Cal.Rptr.3d 2, 310 P.3d 925[proposed interpretation "would lead to absurd results the Legislature cannot have intended"]; Fireman's Fund Ins. Co. v. Superior Court (2011) 196 Cal.App.4th 1263, 1281, 127 Cal.Rptr.3d 768, fn. omitted ["We cannot conclude that our Legislature intended such absurd results."]; Simmons v. Ghaderi (2008) 44 Cal.4th 570, 586, 80 Cal.Rptr.3d 83, 187 P.3d 934["Because the language of section 1122 unambiguously requires express waiver, judicial construction is not permitted unless the statutes cannot be applied according to their terms or doing so would lead to absurd results, thereby violating the presumed intent of the Legislature."].)
I see nothing even remotely "absurd" about giving effect to the definition in section 1170.18(c)according to its plain meaning. On the contrary, by adopting a narrowed definition of "unreasonable risk of danger to public safety," the voters impliedly found that courts had interpreted that phrase too broadly in denying relief under Proposition 36. Given that implied finding, there was nothing unreasonable, let alone absurd, in extending the benefits of the narrowed definition to defendants whose Proposition 36 applications remained unresolved.
*1199 V. The Contrary-to-Manifest-Intent Exception
A somewhat more nebulous rule permits departures from a statute's literal language " 'to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole.' " (California Highway Patrol v. Superior Court,supra, 158 Cal.App.4th at p. 736, 70 Cal.Rptr.3d 280, italics added.) Under this exception the question is whether "follow[ing] the plain meaning of a statute ... would 'frustrate [ ] the manifest purposes of the legislation as a whole....' " (California School Employees Assn. v. Governing Board (1994) 8 Cal.4th 333, 340, 33 Cal.Rptr.2d 109, 878 P.2d 1321, italics added, quoting People v. Belleci (1979) 24 Cal.3d 879, 884, 157 Cal.Rptr. 503, 598 P.2d 473.) Here no conflict between the literal meaning and manifest purpose of section 1170.18(c)appears. The statute can be applied to cases arising under Proposition 36 without impinging in any way upon the purposes or effects of Proposition 47. Indeed, as noted above, extending the benefits of the new definition to persons in defendant's position is fully consistent with the curative purpose readily inferred from its adoption.
The majority points to no evidence of a "manifest purpose" that would be frustrated or impaired by literal application. It does not attempt to demonstrate that the will of the electorate would be thwarted, or the purpose of Proposition 47 frustrated, by applying section 1170.18(c)according to its terms. Instead the majority's treatment rests on the premise that the will of the electorate is not adequately corroborated by extrinsic evidence of legislative intent, which in the majority's treatment consists entirely of the ballot pamphlet. But in the absence of some conflict between the statute's literal meaning and the affirmatively manifested intentions of the electorate, there is no occasion to look for corroboration of the voters' intent. Any inquiry under the "manifest intention" rubric should begin and end with the absence of evidence that voters intended the new definition not to benefit persons in defendant's position.
Unless applied with assiduous judicial restraint, the manifest intention rule becomes a serious threat to the separation of powers. In implicit recognition of this fact, we have stated that "courts should *437 disregard unambiguous language 'only in "extreme cases "-those in which, as a matter of law, the Legislature did not intend the statute to have its literal effect '." (California Highway Patrol v. Superior Court,supra, 158 Cal.App.4th at p. 739, 70 Cal.Rptr.3d 280, italics added, quoting Gorham Co., Inc. v. First Financial Ins. Co. (2006) 139 Cal.App.4th 1532, 1544, 44 Cal.Rptr.3d 197.) Here there is no manifestation of intent by the voters that section 1170.18(c)should not "have its literal effect"-let alone grounds to find such an intent "as a matter of law," meaning one on which reasonable minds cannot differ. At the same *1200 time, there is affirmative evidence-in the plain language voters adopted-that they did intend section 1170.18(c)to govern cases such as defendant's. Nor can this case seriously be characterized, under any fair assessment of the relevant factors, as involving an "extreme" divergence between literal and inferred legislative intentions. Even if credited, the majority's argument cannot make the case more than doubtful and debatable. Under such conditions, the words of the enactment must control.[1]
VI. "Drafting Error"
A. No Error by Drafters
The majority makes no explicit attempt to bring this case within any of the foregoing exceptions to the plain meaning rule. Instead it invokes what may be the rarest and narrowest of such exceptions, under which courts may correct a "drafting error" in statutory language. The majority concludes, in other words, that when the drafters of Proposition 47 wrote "throughout this Code," they actually meant "in this act." On the face of the statute this premise seems extremely unlikely. Two subparagraphs before the provision at issue, the drafters had pointedly adopted the phrase "this act" as an abbreviation for later use. Section 1170.18, subdivision (a), refers to persons "who would have been guilty of a misdemeanor under the act that added this section ('this act') ." (§ 1170.18, subd. (a).) It is difficult to believe that drafters would then almost immediately use "this Code" in place of the abbreviation they had just adopted.
In contrast to some initiative measures, Proposition 47 appears to have been authored by persons of no small legal ability. One of the official proponents was George Gascón, the San Francisco District Attorney. (George Gascón, Letter to Office of the Attorney General, Dec. 14, 2013[2] ; Ballot Pamp., General Elec. (Nov. 4, 2014), argument in favor of Prop. 47, *1201 p. 38.) It also appears that the Stanford Justice Advocacy Project (SJAP)-an officially recognized student organization at Stanford Law School-contributed to the drafting of the measure. (Ho, Prop. 47: Deep split over law reducing 6 felonies to misdemeanors *438 -S.F. Gate (Nov. 5, 2015)) [stating that, according to Gascón, SJAP "helped draft Prop. 47"][3] ; Romano, et al., Proposition 47 Progress Report: Year One Implementation (Oct.2015), p. 1 [according to its Director, SJAP "was involved in the drafting of Proposition 47...."][4] ; Organizations Archive - Stanford Law School, < https://law.stanford.edu/organizations/?first_letter=J & page=1> (as of [guide to student organizations on school website].) Another article identifies Lenore Anderson, executive director of Californians for Safety and Justice, as an author. (Chang, et al., Unintended consequences of Prop. 47 pose challenge for criminal justice system, L.A. Times (Nov. 6, 2015).)[5] According to that organization's website, she was formerly "Chief of Policy and Chief of the Alternative Programs Division at the San Francisco District Attorney's Office, where she spearheaded initiatives to reduce recidivism and improve public safety. She also crafted local and state legislation to aid victims of domestic violence, protect violent crime witnesses, reduce elementary school truancy and reduce recidivism among people convicted of nonviolent crimes." (Californians for Safety and Justice, Our Staff, < http://www.safeandjust.org/About-Us/ourteam> (as of Mar. 11, 2016) italics added.)
I cannot subscribe to the notion that the San Francisco District Attorney, a former deputy district attorney experienced in drafting legislation, and a collective of Stanford law students wrote "throughout this Code" when they meant to write "in this act." There are many ways the drafters could have expressed the meaning imputed to them by the majority, and "throughout this Code" is patently not one of them. Any member of the bar-and any student capable of gaining admission to Stanford Law School-would immediately recognize that "throughout this Code" means something quite different from "in this act." I have no doubt that when the drafters wrote "throughout this Code," that was exactly what they meant. And since section 1170.126(f)is the only other place in the Penal Code where the defined phrase appears, they must have understood and intended this language to extend Proposition 47's definition of dangerousness to petitions filed under Proposition 36.
Indeed, it appears that almost simultaneously with the adoption of the later measure, one of its drafters was publicly recorded as expecting the newly *1202 adopted definition to apply to Proposition 36 applicants. As reported in a Los Angeles Times article published the day after the election, the Director of SJAP stated that Proposition 36 petitioners could "return to court and cite Proposition 47's new definition of an 'unreasonable risk of danger,' which Tuesday's ballot measure defined as likely to commit serious or violent crimes that include homicide, sexual assault and child molestation." ( (as of Mar. 11, 2016).)
The majority describes defendant's assertion of this fact as a "claim," though it was reported by a highly reputable newspaper *439 and accepted as fact in one of the now-uncitable decisions whose analysis the majority otherwise embraces. The majority then declares the assertion "irrelevant" because " '[i]n construing a statute we do not consider the objective of an authoring legislator when there is no reliable indication that the Legislature as a whole was aware of that objective and believed the language of the proposal would accomplish it.' " (Lead opn. at p. 20, quoting Calvillo-Silva v. Home Grocery, supra, 19 Cal.4th 714, 726-727, 80 Cal.Rptr.2d 506, 968 P.2d 65.) This may be conceded as a general matter where enactments of the Legislature are concerned; but there is ample authority to contrary effect with respect to voter-adopted measures. (See Carman v. Alvord (1982) 31 Cal.3d 318, 331, fn. 10, 182 Cal.Rptr. 506, 644 P.2d 192[while not dispositive of the meaning of an initiative amendment, "an after-the-fact declaration of intent by a drafter ... may deserve some consideration"]; Stanton v. Panish (1980) 28 Cal.3d 107, 114, 167 Cal.Rptr. 584, 615 P.2d 1372[drafter's declaration "may be considered in the absence of evidence that the electorate may have had reason to understand the provision differently"].)
Here in particular, where the plain meaning of the measure is dismissed as the product of a "drafting error," I find it highly relevant that an author of the statute flatly contradicted the claim-and did so at a time when, apparently, no dispute had yet arisen on the subject. After all, a mistake by the legislation's author (or a "scrivener," i.e., a transcriber of the author's intent) is precisely what a claim of "drafting error" posits. A statement by an author that the statute says exactly what he or she meant it to say, and has the effect he or she meant it to have, should utterly dispel any claim of a "drafting error" subject to judicial correction.
B. Narrowness of Exception
The judicial power to correct legislative drafting errors is to be employed only with "great restraint." (Bonner v. County of San Diego (2006) 139 Cal.App.4th 1336, 1346, fn. 9, 44 Cal.Rptr.3d 116;
*1203 Miklosy v. Regents of University of California (2008) 44 Cal.4th 876, 905, 80 Cal.Rptr.3d 690, 188 P.3d 629(conc. opn. of Werdegar, J.).) This restraint serves a critical constitutional function, because any judicial refusal to apply a statute according to its terms threatens to impinge upon the coequal power of the legislative branch.[6] The exercise of such a power threatens both to weaken the people's representatives-or in this context, the people themselves-and to relieve them of the responsibility to act with diligence and circumspection in choosing and adopting statutory language. To avoid such effects, courts can and should disregard statutory language under the rubric of a "drafting error" only where it is clear that the statute was inartfully drawn so as to affirmatively misstate the otherwise plainly established intent of lawmakers. (See Gray Cary Ware & Freidenrich v. Vigilant Ins. Co. (2004) 114 Cal.App.4th 1185, 1193-1194, 8 Cal.Rptr.3d 475, italics added ["The separation of powers doctrine prevents us from rewriting statutes that do not conflict with the Constitution, other than to correct an obvious and minor drafting error where necessary to effectuate the intent of the Legislature."].)
It happens that Proposition 47 does contain an "obvious and minor drafting error"-an omitted "as"-that would warrant *440 judicial correction in a proper case.[7] The error is obvious in the sense not that it is conspicuous but that, once noticed, it cannot be attributed to anything but inadvertence. This is precisely the sort of mistake that courts have remedied under the rubric of a drafting error. Thus in Szold v. Medical Bd. of California (2005) 127 Cal.App.4th 591, 25 Cal.Rptr.3d 665(Szold ), the word "or" had been replaced by "of" as a bill progressed through the Legislature. Although this changed the meaning of the statute in an important respect, the bill continued to be described in legislative materials as possessing its original meaning and effect. From these clear proofs the court could safely conclude that "the Legislature intended to specifically require" what the adopted language failed to require, "and that the insertion of the word 'of' for 'or' was an inadvertent drafting error" which should not be given effect. (Id. at p. 598, 25 Cal.Rptr.3d 665.) In contrast, no slip of the fingers can cause one to type "this Code" when one means to type "this Act." *1204 Nor does Proposition 47's use of "throughout this Code" bear any resemblance to the drafting errors that courts have corrected in other cases. The Szold court cited People v. Superior Court (Blanquel) (2000) 85 Cal.App.4th 768, 771, 102 Cal.Rptr.2d 429, where circumstances furnished an objective basis to infer the accidental omission of cross-references to certain predecessor statutes in the course of a complex reorganization of a portion of the code. Similarly, in People v. Alexander (1986) 178 Cal.App.3d 1250, 1265, 224 Cal.Rptr. 290, this court rejected a contention that the Legislature had impliedly pardoned the defendant for his sale of PCP when, "in the 'hurry and confusion' of major legislative activity involving changes in over 100 statutes, the Legislature, through an inadvertent drafting error, eliminated for a period of 29 days the sanctions against selling PCP." Here of course there was no similar hurry or confusion that might reasonably lead to details being overlooked. The drafters were required to prepare only one measure consisting of 18 sections. They had all the time they wanted or needed to ensure that it expressed their intentions. The voters, for their part, had access to the measure's language for months before they were called upon to cast their ballots.[8] *441 Another illustration of a legislative drafting error is provided by this court's decision in In re Chavez (2004) 114 Cal.App.4th 989, 998, 8 Cal.Rptr.3d 395(Chavez ). The question there was whether a change in the sentence for tax fraud was intended to apply retroactively so as to abate the defendant's sentence under prior law. We concluded that the purpose of the change was to correct an anomaly introduced by an earlier amendment, which had been in effect when the defendant was sentenced. That amendment had been part of "voluminous" 1983 legislation that was largely concerned with public education and its funding, but that also included provisions conforming state tax law to certain changes in federal law. (Id. at p. 994, 8 Cal.Rptr.3d 395.) One of the conforming changes echoed the federal tax fraud statute, with the result that the California statute now imposed an indeterminate sentence despite this state's broad abandonment of indeterminate sentencing six years earlier. (Id. at p. 995, 8 Cal.Rptr.3d 395.) The bill correcting this anomaly was described in its legislative history as a "cleanup bill" needed " 'to correct technical and grammatical errors in penal provisions in various codes.' " (Id. at p. 995, 8 Cal.Rptr.3d 395.) The *1205 attorney general argued to us that the earlier adoption of an indeterminate term had been a deliberate effort to increase deterrence, but we found it "far more likely that SB 813's incongruous and unexplained reversion to indeterminate sentencing was the result of the drafters' attempt to track the federal language as closely as possible." (Id. at p. 997, 8 Cal.Rptr.3d 395.) We thus concluded that, "[g]iven the legislative history and the surrounding circumstances ... the 1983 amendment was a drafting error and was not enacted for any deterrent purpose." (Id. at p. 998, 8 Cal.Rptr.3d 395.) We noted that a " 'dangerous potential for drafting errors' " had been created by the extreme complexity of the 1983 bill and the fact that it had been focused on educational reforms rather than criminal law. (Ibid., quoting People v. Alexander,supra, 178 Cal.App.3d 1250, 1262, 224 Cal.Rptr. 290.) Because the later amendment was intended to " 'fix a mistake,' " we inferred an intent that it be applied retroactively. (Id. at p. 998, 8 Cal.Rptr.3d 395, quoting In re Marriage of Petropoulos (2001) 91 Cal.App.4th 161, 172, 110 Cal.Rptr.2d 111.)
None of these factors were present here. There was no necessity, and no apparent attempt, to track laws promulgated by another sovereign. There was no "extreme complexity." Proposition 47 was not focused on some tangentially related subject; both it and Proposition 36 sought to bring about the release of nondangerous prisoners in order to free resources for other purposes. The one similarity between this case and Chavez is that section 1170.18(c)was indeed intended to "fix a mistake" in a sense, and for that reason should be applied retroactively. But its use of the phrase "throughout this Code" bears no resemblance to the drafting error found in Chavez or in any of the other cases I have examined.
More nearly resembling this case is this court's decision in In re Gabriel G. (2005) 134 Cal.App.4th 1428, 1436, 36 Cal.Rptr.3d 847, where we rejected an argument by a child welfare agency that a statutory provision governing dependency dispositions "must have been inadvertent" because it would produce consequences the Legislature could not have intended. We noted that the language at issue had been adopted to correct "what was unquestionably a drafting error," i.e., a transposed "or" in the phrase, " 'paragraph (1), (3), or of subdivision (b).' " (Id. at p. 1437, 36 Cal.Rptr.3d 847, quoting Stats.2003, ch. 813, § 7, p. 4749.) The Legislature's attention *442 to the language on that occasion militated against the hypothesis that the amending language was itself the product of inadvertence.
Similarly, in People v. Garcia (1999) 21 Cal.4th 1, 4, 6, 87 Cal.Rptr.2d 114, 980 P.2d 829, the Supreme Court refused to base its construction of a provision of the "Three Strikes" law on a posited " 'drafting oversight' " or " 'drafting error' " as manifested in a supposed discrepancy between two otherwise redundant provisions of the Three Strikes law. The court found such an approach untenable because it would "require the court to disregard *1206 one of the two assertedly conflicting paragraphs or to rewrite some of their provisions. Although we may properly decide upon such a construction or reformation when compelled by necessity and supported by firm evidence of the drafters' true intent (see, e.g., People v. Skinner (1985) 39 Cal.3d 765, 775, 217 Cal.Rptr. 685, 704 P.2d 752), we should not do so when the statute is reasonably susceptible to an interpretation that harmonizes all its parts without disregarding or altering any of them ." (Id. at p. 6, 87 Cal.Rptr.2d 114, 980 P.2d 829, italics added.)
Here no "necessity" compels us to disregard the plain meaning and effect of "throughout this Code." Nor is there any "firm evidence," or any evidence, that this language contravenes, subverts, frustrates, impairs, conflicts with, or departs from the "drafters' true intent." On the contrary, the only reliable evidence of that intent is the statutory language itself. The cases concluding otherwise have declined to adhere to the voters' plainly expressed intent not because it is repugnant to anything in the statutory language or history, but because it is not corroborated by some additional evidence assuring us that the voters really meant what they quite clearly said. Such an approach cannot be validated by invoking the concept of a "drafting error."
C. Intrinsic Confirmation of Literal Meaning
If I thought there were sufficient reason to look behind the plain meaning of section 1170.18(c), I would begin with a careful examination of the text of that and related provisions. This is appropriate because " '[i]n interpreting a voter initiative ...', "we turn first to the language of the [initiative], giving the words their ordinary meaning." [Citation.] The [initiative's] language must also be construed in the context of the statute as a whole and the [initiative's] overall ... scheme." (Professional Engineers in California Government v. Kempton (2007) 40 Cal.4th 1016, 1037, 56 Cal.Rptr.3d 814, 155 P.3d 226, quoting People v. Rizo (2000) 22 Cal.4th 681, 685, 94 Cal.Rptr.2d 375, 996 P.2d 27, bracketed material in original; see People v. Arias (2008) 45 Cal.4th 169, 177, 85 Cal.Rptr.3d 1, 195 P.3d 103["If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent, '[s]tatutory ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes.' "].) Such an examination reveals considerable textual evidence that the drafters of Proposition 47 did positively intend to extend Proposition 47's dangerousness standard to Proposition 36 petitions.
First, as pointed out above, shortly before using the phrase "this Code" to describe the reach of the definition in section 1170.18(c), the drafters had deliberately adopted the phrase " 'this act' " as shorthand for Proposition 47. (§ 1170.18, subd. (a).) They proceeded to employ this shorthand *1207 phrase no fewer than seven times in *443 section 1170.18, including in subdivision (b), which contains the phrase defined in the next subdivision "[a]s used throughout this Code." (§ 1170.18(c).) It strains credulity to suppose that they slipped into using a gross misnomer when they really meant to use "this act" for an eighth time.
The majority's construction of section 1170.18(c)is also at odds with the use of the term "throughout" in the phrase "as used throughout this Code." It is not enough to simply substitute "act" for "Code," because in the majority's reading the definition does not apply "throughout" anything, even the act. The defined phrase appears only in one place: Penal Code section 1170.18, subdivision (b). If the intent was only to define that phrase as used in that subdivision, it would have been more felicitously expressed by saying "as used in this section" or at most, "in this act." "Throughout," in other words, implies that the defined phrase appears in more than one place. In fact, the phrase appears in two-Penal Code section 1170.18, subdivision (b), and section 1170.126(f). "Throughout" is consistent with an intent to refer to both of them. It is not consistent with an intent to refer to only one.
The text of Penal Code section 1170.18reinforces the plain meaning of subdivision (c) for a subtler, but I think even more compelling, reason: in the absence of an intent to benefit Proposition 36 petitioners, there was no reason to write Penal Code section 1170.18the way it is written; it could have been drawn in a significantly simpler and more straightforward manner. Recall that Proposition 36 requires resentencing unless the court determines that resentencing would pose "an unreasonable risk of danger to public safety." (§ 1170.126(f).) The drafters of Proposition 47 copied the quoted phrase into Penal Code section 1170.18, subdivision (b), although it was already in use and its meaning and effect had been extensively litigated under Proposition 36. Had the drafters simply borrowed that phrase, it would suggest that they expected and intended courts to possess the same broad discretion under Proposition 47 they had been held to have under Proposition 36. Instead, the drafters redefined the borrowed phrase to mean something new: "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18(c).) This had the effect of sharply restricting the latitude courts had been allowed, or found themselves to be allowed, under Proposition 36. But if the intent was to restrict judicial discretion only for purposes of Proposition 47, there was no reason to introduce the earlier phrase from Proposition 36 . Penal Code section 1170.18, subdivision (b)could simply have been drafted to say that resentencing would be required unless the court found an unreasonable risk that the petitioner would "commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18(c).) The drafters could, in short, have stricken the phrase they *1208 borrowed from Proposition 36 and incorporated the new test directly into section subdivision (b), eliminating any need for subdivision (c). This would not only shorten and simplify Proposition 47; it would obviate any risk that Proposition 36 petitioners would attempt to take advantage of the new test. That the drafters instead lifted a phrase from Proposition 36, and then redefined it in a substantially narrower way, can only be explained as intended alter the rule of decision in Proposition 36 petitions so as to constrain the broad discretion courts had been exercising to deny relief under that measure. *444 Another very familiar rule of statutory construction-repeatedly acknowledged by us-is that " '[w]e must ...' 'if possible, ... give effect and significance to every word and phrase of a statute.' [Citation.] When two provisions touch upon a common subject, 'we must construe them "in reference to each other, so as to 'harmonize the two in such a way that no part of either becomes surplusage.' " ' [Citations.] 'We must presume that the Legislature intended "every word, phrase and provision ... in a statute ... to have meaning and to perform a useful function." ' [Citations.]" (Meyers v. Retirement Fund of Fed. City Employees (2014) 223 Cal.App.4th 1201, 1206, 167 Cal.Rptr.3d 725; Nativi v. Deutsche Bank National Trust Company (2014) 223 Cal.App.4th 261, 283-284, 167 Cal.Rptr.3d 173[" 'The rules of statutory construction direct us to avoid, if possible, interpretations that render a part of a statute surplusage.' [Citations.] [Citation.] Courts 'must strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous.' [Citations.] [Citation.] The well-established principles of statutory construction "preclude judicial construction that renders part of the statute 'meaningless or inoperative.'."]; People v. Scott (2012) 203 Cal.App.4th 1303, 1313, 138 Cal.Rptr.3d 236["We also attempt to give effect to every word in a statute and avoid constructions that render statutory terms superfluous or meaningless."]; Murray's Iron Works, Inc. v. Boyce (2008) 158 Cal.App.4th 1279, 1296, 71 Cal.Rptr.3d 317["A construction making some words surplusage is to be avoided."]; Toshiba America Electronic Components, Inc. v. Superior Court (2004) 124 Cal.App.4th 762, 769, 21 Cal.Rptr.3d 532[same]; People v. Superior Court (2003) 114 Cal.App.4th 102, 104, 7 Cal.Rptr.3d 440[" 'Where reasonably possible, we avoid statutory constructions that render particular provisions superfluous or unnecessary.' "].)
The majority's treatment renders superfluous Proposition 47's use of the phrase "unreasonable risk of danger to public safety." Under the majority's view, that phrase has no effect in Proposition 47 other than to complicate and lengthen the statute. Under a correct view, as I see it, that phrase can readily be understood, in support rather than derogation of the measure's plain meaning, to serve the very purpose of correcting the courts' unduly parsimonious approach to petitions under Proposition 36.
*1209 VII. Voter Appreciation of Consequences
A. Unsound Legal Premise
If the majority's treatment has any basis in historic fact, it must be not that the drafters used words they didn't mean, but that the voters were insufficiently aware of the legal effect of those words, and thus did not appreciate the consequences of their vote. I question the factual assumption on which this reasoning rests, but more fundamentally I do not believe it states an adequate reason to disregard plain statutory language.[9] The majority *445 acknowledged as much in In re Gabriel G.,supra, 134 Cal.App.4th 1428, 1436, 36 Cal.Rptr.3d 847, where the plain meaning of a statute was challenged on the ground that it produced unintended consequences: "[W]e must recall that in construing a statute, 'that which is construed is the statutory text.' [Citation.] Evidence of legislative inadvertence would have to be quite compelling before we would ignore the plain language of the law. [Citation.] The only evidence of inadvertence the Department offers is its assessment of the unintended consequences the change will have. Legislation often has unintended consequences. But we cannot construe the amendment in a manner wholly unsupported by its text merely to avoid the purported unintended consequences. [Citation.]" (Id. at pp. 1436-1437, 36 Cal.Rptr.3d 847, italics added.)
Again I must observe that a due regard for the separation of powers requires that when the legislative will is expressed in clear language which does not frustrate other manifestations of legislative intent and does not produce absurd results, lawmakers must be deemed to have intended the effect of their enactments, whether or not we find it likely that they actually did so. The tacit premise of the majority's treatment is that where an effect may have been inobvious to voters, the absence of extrinsic corroboration of their intent is by itself sufficient ground for courts to deny the enactment that effect, no matter how inexorably it may flow from the words they have adopted. That premise turns the "manifest purpose" exception on its head by authorizing courts to disregard clear statutory language unless it is affirmatively ratified by other evidence of legislative intent. This reverses the proper burden of proof, which should rest on those who seek to deny effect to plain *1210 language-not those who seek to enforce an enactment according to its terms. I know of no precedent for such an approach. (Cf. Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245-246, 149 Cal.Rptr. 239, 583 P.2d 1281, italics added ["[T]he ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language ."].) In my view, any inquiry into the voters' intent is precluded by the facts that (1) the language is clear and (2) nothing in the measure or its history suggests, let alone "manifests," an intention by the electorate not to bring about the effects flowing from that language.
B. Evidence That Consequences Were Acknowledged
If I thought an inquiry into voter intentions were supportable, I would still take exception to confining it, as the majority does, to the contents of the ballot pamphlet. The majority understates the extent to which the effect of section 1170.18(c)on Proposition 36 petitions was acknowledged-invariably by opponents of the measure-prior to the election.[10] After *446 minimizing the extent and tenor of these materials, the majority suggests that we can assign *1211 no significance to them because it is "unclear how widely disseminated these arguments were prior to the election and if the electorate was even aware of these arguments before they voted Proposition 47 into law." (Lead opn. at p. 18, fn. 8.) But this, again, reverses the burden of proof. The burden is not on the proponent of a measure's plain meaning to adduce extrinsic evidence proving that voters were made subjectively aware of a contested effect. The burden is on those who would disregard the plain meaning to adduce affirmative evidence that the effects flowing from the measure's language are contrary to the will of those who adopted it. Evidence that the true meaning and effect of the statute were acknowledged in public debate is relevant to refute claims of voter ignorance, though it is by no means necessary. In any event it cannot be ignored due to mere doubts about "how widely disseminated these arguments were." Where the plain meaning of an enactment is challenged on the ground that voters did not understand its legal effect, it seems to me that any evidence of public awareness has a logical tendency to rebut the factual premise on which the challenge rests.
Evidence that a challenged effect was acknowledged and debated in the public arena also flatly refutes any suggestion that the effect was so subtle as to go entirely unnoticed. Implicit in some of the not-to-be cited decisions is the suggestion that the drafters had essentially duped voters by slipping a redefinition of dangerousness into Proposition 47 without highlighting its effect on Proposition 36 petitions. Again, I do not think such a premise affords any occasion for judicial abrogation of plain statutory language. If *447 it does, we may anticipate that the opponents of numerous past ballot measures-including some of far greater moment than Propositions 36 and 47-will soon be filing new challenges to their more obscure provisions. Perhaps there could arise an extreme case where a challenged effect was so obscure, unheralded, and momentous as to make a truly compelling case for judicial intervention. But surely this is not such a case. As the above materials demonstrate, the meaning and effect of "throughout this Code" were neither obscure nor unheralded. All the majority can say is that they were not specifically mentioned in the ballot pamphlet. That is not nearly enough, in my view, to justify judicial abrogation of plain statutory language.
Confining the inquiry into voter intent to the four corners of the ballot pamphlet is particularly objectionable because the contents of that document *1212 are constrained by considerations of space, time, and comprehensibility, requiring countless judgments by the contributors to the pamphlet as to what effects of a measure are sufficiently material to warrant discussion. The official summary of any ballot measure is authored by the office of the Legislative Analyst. (Elec.Code, §§ 9087, 9086, subd. (b).) The summary is required only to "generally set forth in an impartial manner the information the average voter needs to adequately understand the measure ." (Elec.Code, § 9086, subd. (b), italics added.) The preparer of such a summary must be given considerable latitude in determining what to include. (See Brennan v. Board of Supervisors (1981) 125 Cal.App.3d 87, 96, 177 Cal.Rptr. 677["Faced with the difficult task of simplifying a complex proposal, the Committee drafted a summary which, if not all-encompassing, at least briefly described its major subjects."]; ibid .["[T]he Committee's ballot summary, while technically imprecise, omitted only auxilliary [sic ] or subsidiary matters, fairly represented the measure and thus was in substantial compliance with the law."].) In particular, there is no requirement that the analysis attempt to describe every way in which a measure may change the law; rather it "may contain background information, including the effect of the measure on existing law ." (Elec.Code, § 9087, subd. (b), italics added.) The Analyst is thus called upon only to make a rational judgment about what effects are most likely to matter to voters, and to describe them in a fair and intelligible way. Given the limited number of persons affected by the use of "this Code" in section 1170.18(c), it seems entirely likely that the Analyst failed to mention it not out of ignorance or neglect but because it was expected to matter less to voters than other features of the measure.
Assuming the Legislative Analyst does not find a given effect sufficiently material to warrant mention, the burden then falls to the official proponents and opponents of a measure to highlight any effects that they believe (1) may otherwise escape voters' attention, and (2) may affect the vote of a significant number of electors. To be sure, determining what effects to mention in these arguments may require an even more radical triage than is required of the Legislative Analyst. Official ballot arguments are apparently restricted to 500 words for opening and 250 words for rebuttal. (See Elec.Code, §§ 9062, 9069, cf. id ., § 9041.) This means the advocates must select a limited number of points to include in the official argument, relying on other modes of communication for any other points they believe may induce voters to cast a ballot in their favor.
I believe that courts are constrained by the separation of powers to trust not only the ballot contents, but arguments in the public arena, to ensure that the text of *448 adopted measures reflects the actual will of the voters. Here the evidence suggests that at least two of the official opponents of Proposition 47 were entirely aware of its effect on Proposition 36 petitions but elected not to cite that effect in the ballot pamphlet as a reason to vote no, relying instead *1213 on public media to bring it to voters' attention. Two of the three opposition authors named in the ballot pamphlet are Christopher W. Boyd, president of the California Police Chiefs Association (CPOA), and Gilbert G. Otero, president of the California District Attorneys Association (CDAA). (Ballot Pamp., General Elec. (Nov. 4, 2014), argument against Prop. 47, p. 39; [web cite].) CPOA is identified by the Secretary of State as a contributor to the lead opposition entity, Californians Against Proposition 47 (CAP47). (California Secretary of State-CalAccess-Campaign Finance < http://cal-access.ss.ca.gov/Campaign/Committees/ Detail.aspx?id=1368083 & session=2013 & view=received> (as of Mar. 11, 2016).) Among the materials of which defendant seeks judicial notice is a printout of a page, published prior to the 2014 election, from CAP47's website.[11] That page recapitulates portions of what it describes as an "extensive evaluation of Proposition 47 from the [CDAA]." It seems to have drawn most of its content verbatim from the CDAA "evaluation."[12] It reports that, according to the CDAA, Proposition 47 would "impose an impossibly demanding standard of proof in resentencings, including the three strikes resentencings enacted in 2012's Proposition 36 ." (Italics added.) Later it elaborates on this asserted failing: "[T]his proposed new definition of 'dangerousness' ... applies to any resentencing permitted by the Penal Code .... By referring to 'Code,' § 1170.18would alter the meaning of 'unreasonable risk of danger to public safety,' not only as it is applied in § 1170.18resentencing hearings, but in all other hearings that rely on the dangerousness standard throughout the entire Code .... [¶] Moreover, for any of the Three Strikes defendants previously denied resentencing based upon a judicial finding of dangerousness, may appeal that ruling and request the court now apply this new standard of dangerousness, resulting in a further cost to a court system already struggling financially." (Italics added.)
In short, one opposition author was president of an organization that wrote a paper specifically citing the effect on Proposition 36 petitions, and another *1214 was president of an organization that contributed to an entity whose website highlighted that effect as a reason to vote no. Their failure to cite this effect in the ballot pamphlet supports an inference, not that the effect was too obscure to be noticed, but that opponents did not think it a powerful enough argument for inclusion in the limited space available to them. This in turn suggests that by invalidating the plainly expressed will of the voters, the courts are handing opponents of the measure a victory *449 they could not, and knew they could not, win at the ballot box.
I simply do not believe it is the office of the courts to protect voters, if that is what they think they are doing, from the legal consequences of their votes. Such an approach is doubly objectionable where, as here, it appears that voters had knowledge, or at least notice, of those consequences. In the absence of absurdity, constitutional infirmity, or frustration of an affirmatively manifested purpose, a voter-adopted statute must be given effect according to its plain meaning. I therefore can no longer join in the chorus of judicial voices that have sought to frustrate the intent of the 2014 electorate as manifested by them in the only way that matters.
VIII. Timing Considerations
The majority also concludes that "practical reasons" weigh against applying "throughout this Code" literally because "[i]t is illogical to conclude that Proposition 47 was meant to modify the Reform Act when most of the three strike resentencing petitions were already adjudicated and decided by that time." (Lead opn. at p. 21.) The basis for this assertion is not clear. One possible argument is that (1) the time to file Proposition petitions would have nearly expired when Proposition 47 took effect; (2) because of this, few if any such petitions were likely to remain "[un]adjudicated and [un]decided" at that time; (3) the new definition could only apply to petitions that remained unadjudicated and undecided; (4) extending the new definition to Proposition 36 petitions would therefore be futile; therefore (5) voters could not have intended a futile act.
If this is the underlying reasoning, I find it badly flawed. The first premise fails because Penal Code section 1170.126, subdivision (b), permits an eligible prisoner to "file a petition for a recall of sentence, within two years after the effective date of the act that added this section or at a later date upon a showing of good cause ." Voters could well anticipate, and I would be inclined to hold, that a change in law requiring the petitioner's more-or-less immediate release from prison constitutes "good cause" to entertain a petition beyond the two-year deadline.
The second premise fails because there are many cases like this one in which the defendant's Proposition 36 petition remains pending on appeal and *1215 has thus not been finally adjudicated or decided. Voters could well anticipate that at least these petitioners would be able to avail themselves of the change in law occasioned by section 1170.18(c). To suppose otherwise is to assume that they did not intend the measure to have any retroactive effect-a point the majority professes not to address. (See Lead opn., p. 22, fn. 9.)
I will concede the third premise, for present purposes, to this extent: there may indeed be no procedure by which, on November 4, 2014, a prisoner could mount a challenge, based upon the change in law effected by section 1170.18(c), to the denial of a Proposition 36 petition that had been denied in the trial court and had passed beyond the time for appellate review . (See 6 Witkin & Epstein, Cal.Criminal Law (4th ed. 2012) Criminal Judgment, § 193, pp. 238-240[writ of error coram nobis (motion to vacate) ]; 3 Witkin & Epstein, supra, Punishment, § 394, pp. 608-609 [ordinary motion to recall sentence]; 6 Witkin & Epstein, supra, Criminal Writs, § 45-66, pp. 655-684 [grounds for habeas corpus]; cf. In re Estrada (1965) 63 Cal.2d 740, 744-745, 48 Cal.Rptr. 172, 408 P.2d 948[inference that legislative reduction in punishment was intended to benefit all defendants whose convictions were not yet final].) But the argument fails without or without the third premise, so long as Proposition *450 36 denials still pending on appeal would be subject to correction based on the change in law effected by section 1170.18(c). If that is true, the fourth premise also collapses and the fifth with it.
Whatever the logical underpinnings of the majority's treatment on this point, I cannot accede to any suggestion that the number of persons to be affected by a statute can justify abrogation of its unambiguous terms. Even if only a handful of cases were likely to be affected, it would furnish no occasion to disregard the plain meaning of the statute. To posit a regime in which courts are empowered to disregard legislative directives on the ground that their effects are too insignificant to have been intended is, yet again, obnoxious to the proper separation of powers. It is not for the courts to decide what objectives are sufficiently weighty to merit legislative attention. Least of all does it fall to the courts to decide when a court may abrogate legislation touching on a fundamental right such as physical liberty because it finds the number of citizens benefiting from it too small to bother with.
Here, as already noted, it can be readily inferred from the very existence of section 1170.18(c)that its purpose was to correct what the drafters saw as an undesirable judicial interpretation and application of Proposition 36. Once the prior regime was perceived as unsatisfactory, it was entirely logical not only to create a new regime but to extend its benefit to anyone still seeking relief under its predecessor. The logic of doing so is the same whatever the size of the class so benefited. Lawmakers are under no obligation to count heads before deciding whether to remedy perceived defects in existing law. They *1216 may act on the basis of one or two cases, or for that matter anecdotes, concerning an undesirable consequence of existing law. They are fully empowered to adopt corrective measures whether the class of those benefited proves to count a million, a hundred, or one. Nor is there anything "illogical" about extending a remedy to less than the entire universe of persons to whom it might have been extended. Logic does not demand that all aboard must drown merely because there are too few life rafts for everyone.
Finally, I find the reasoning under scrutiny to be self-contradictory. It imputes to voters a refined calculus about the effect of their enactment on Proposition 36 petitions, but then supposes that they must have considered that effect too trivial to pursue. Of course, if voters indeed understood the effect of section 1170.18(c)and did not wish to bring that effect about, they would have defeated the measure. To overturn the unambiguous words they enacted on the ground that they understood what the language of the measure would accomplish, but did not intend it, is to adopt a mode of statutory construction I have never seen before and cannot join in introducing to our law.
IX. "Savings Clause"
The majority finds tension between the literal meaning of section 1170.18(c)and a provision in Proposition 47 declaring that "[n]othing in this and related sections is intended to diminish or abrogate the finality of judgments in any case not falling within the purview of this act." (Pen.Code, § 1170.18, subd. (n)(§ 1170.18(n)).) According to the majority, "Applying the definition of 'unreasonable risk of danger to public safety' from section 1170.18to section 1170.126, would undoubtedly diminish the finality of those three strikes judgments that do not involve a nonserious, nonviolent property or drug crime." (Lead opn. at p. 21, italics added.) I cannot agree. There is no reason to suppose section 1170.18(n)was intended to preclude *451 application of section 1170.18(c)"throughout this Code" in accordance with its terms. Indeed, insofar as section 1170.18(c)applies to Proposition 36 cases, those cases "fall [ ] within the purview of this act" and are thus exempt from the operation of section 1170.18(n).
Neither the intent nor the letter of section 1170.18(n)is frustrated by applying section 1170.18(c)to Proposition 36 cases, at least where the judgment in those cases has not passed beyond the power of the courts to modify. The plain meaning and manifest purpose of the quoted provision is to prevent a construction of Proposition 47 that operates to reopen proceedings in matters falling outside section 1170.18. Here, the proceeding has been reopened, and is still open, but not by virtue of Proposition 47. It is Proposition 36 that, by authorizing resentencing in cases like this one, has *1217 "diminish[ed] or abrogate[d] the finality" of the judgment before us. The only effect of Proposition 47 is to provide a rule of decision on a subsidiary issue, i.e., whether to deny relief on grounds of dangerousness. Defendant is not relying on Proposition 47 to attack the judgment. He is invoking section 1170.18(c)to provide the rule of decision for a subsidiary issue because that is what the cited section mandates. Complying with that mandate does not "diminish or abrogate" the original judgment, even if it proves dispositive of the Proposition 36 petition. It is still Proposition 36, not 47, that impairs the finality of defendant's sentence.
Had the drafters and voters intended to achieve the result urged by the majority, they could have simply done what the court has now done on their supposed behalf: replaced "throughout this Code" with "in this act" in section 1170.18(c). I would give effect to all of the language chosen by the voters, including the directive that section 1170.18(c)'s definition of dangerousness govern determinations of that issue in Proposition 36 proceedings.
X. Presumptions Favoring Literal Construction
The majority's construction of section 1170.18(c)runs afoul of at least two familiar presumptions concerning the interpretation of doubtful statutory provisions. One dictates that remedial statutes such as Proposition 47 are to be broadly construed in favor of parties invoking their terms. (See People v. Zeigler (2012) 211 Cal.App.4th 638, 658, 149 Cal.Rptr.3d 786["The Proposition 36 statutory scheme is clearly remedial in nature and ...", " 'under well-settled rules of judicial construction, such a statute is to be liberally construed to promote the objects to be accomplished by it.' "]; People v. Rivas-Colon (2015) 241 Cal.App.4th 444, 451, 193 Cal.Rptr.3d 651, quoting People v. Sherow (2015) 239 Cal.App.4th 875, 880, 191 Cal.Rptr.3d 295["Section 1170.18is a 'remedial statute[.]' "].) Indeed, two uncodified sections of Proposition 47, and one of Proposition 36, explicitly dictate such a construction. (See 3 West's Session Laws (2013-2014), pp. A-20 - A-21, §§ 15, 18; 3 West's Session Laws (2011-2012), p. A-53, § 7.)
The other presumption directs that in the absence of more reliable guidance, doubtful provisions of penal statutes are to be construed in favor of the defendant. (People v. Johnson (2007) 150 Cal.App.4th 1467, 1481, 59 Cal.Rptr.3d 405["Where the statute is susceptible of two reasonable constructions, a defendant is ordinarily entitled to that construction most favorable to him."].) If this rule does not apply here, it is only because section 1170.18(c)contains no ambiguity that the presumption can operate to resolve. (See ibid .;
*452 People v. Ramirez (2014) 224 Cal.App.4th 1078, 1085, 169 Cal.Rptr.3d 260["The rule of lenity applies as a tie-breaking principle where ' " 'two reasonable interpretations of the statute *1218 stand in relative equipoise.' " ' [Citation.] Where that situation exists, the court must 'prefer the interpretation that is more favorable to the defendant.' [Citation.]"].) Here there is just one literal meaning. But if the majority's reading of the statute did stand in "relative equipoise" with the plain meaning of the statute (People v. Ramirez, supra, 224 Cal.App.4th at p. 1085, 169 Cal.Rptr.3d 260), this presumption would militate in favor of the latter.
Conclusion
I see no colorable basis here to depart from the plain terms enacted by the voters. I would reverse the judgment with directions to reevaluate the petition in light of the definition of dangerousness set forth in section 1170.18(c).

This was the Supreme Court's conclusion in Calvillo-Silva v. Home Grocery (1998) 19 Cal.4th 714, 726-727, 80 Cal.Rptr.2d 506, 968 P.2d 65, overruled on another point in Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 854, footnote 19, 107 Cal.Rptr.2d 841, 24 P.3d 493, which the majority cites for its recital of the rule that the views of a bill's author, if not communicated to other legislators, are not evidence of legislative intent. The case is more germane for its ultimate holding that the author's statements there were irrelevant because the language at issue furnished no occasion to consult extrinsic evidence of intent. (Id. at p. 727, 80 Cal.Rptr.2d 506, 968 P.2d 65["even assuming other legislators were aware of the author's press release, [the author's asserted intent] cannot be reconciled with the plain meaning of the statutory language"].)

Available on the Attorney General's website < https://oag.ca.gov/system/files/initiatives/pdfs/13-0060¨-13-0060¨-NeighborhoodändS¨choolF¨unding??.pdf?> (as of Mar. 11, 2016).

Available at < http://www.sfgate.com/crime/article/S-F-district-attorney-defends-Prop-47-which-6614091.php> (as of Mar. 11, 2016).

Available at < https://www-cdn.law.stanford.edu/wp-content/uploads/2015/10/Prop-47-report.pdf> (as of Mar. 11, 2016).

Available at < http://www.latimes.com/local/crime/la-me-prop47-anniversary-20151106-story.html> (as of Mar. 11, 2016).

When voters adopt an initiative measure they are exercising legislative power. (Cal. Const., art. IV, § 1.)

Section 1170.18, subdivision (b), provides that resentencing is to take place "pursuant to Sections 11350, 11357, or 11377 of the Health and Safety Code, or Section 459.5, 473, 476a, 490.2, 496, or 666 of the Penal Code, those sections have been amended or added by this act." The absence of an "as" immediately preceding the italicized language turns that language into an independent clause, resulting in a run-on sentence, i.e., two independent clauses joined by a comma splice. This violates basic rules of punctuation. It also renders the italicized phrase superfluous. It is, in other words, a genuine "drafting error," illustrating the fact that no one can achieve absolute perfection in drafting legal language, even when their work is proofread by the Legislative Counsel, as every ballot measure is required to be. (Elec.Code, § 9091.)

See Elections Code sections 9002, subdivision (a)[requiring Attorney General to post proposed initiative on website and solicit public comments prior to circulation]; 9006, subdivision (b) [requiring Attorney General to prepare circulating title and summary within 10 days after receipt]; 9014, subdivision (a) [contemplating that circulation of petition may commence on official summary date]; 9033, subdivision (b)(1) [effectively requiring at least 131 days between date measure is certified for ballot and date of election in which it is to be voted upon]; 9034, subdivision (b) [requiring Legislature to conduct hearings on measure at least 131 days before election]; 9094, subdivision (a) [requiring that ballot pamphlet be sent to voters at least 21 days before election]; 9092 [requiring Secretary of State to make contents of pamphlet available to public at least 20 days before pamphlet sent to printer].

If courts were empowered to abrogate statutes based upon doubts that lawmakers appreciated their effects, government would grind to a halt. It is fanciful to suppose that legislators, or a sizable proportion of them, are aware of all of the consequences, or even contents, of the bills they enact. One online article compares a 1,018-page health care reform bill to earlier federal legislation: "[M]ajor spending bills frequently run more than 1,000 [pages]. This year's stimulus bill was 1,100 pages. The climate bill that the House passed in June was 1,200 pages.... Budget bills can run even longer: In 2007, President Bush's ran to 1,482 pages." (Is 1,000 pages long for a piece of legislation? < http://www.slate.com/articles/news_and_politics/explainer/ 2009/08/paper_weight.html> (as of Mar. 11, 2016.))

Defendant has requested judicial notice of printouts of several of these webpages, but the pages as well as the sources from which they are drawn may still be found either at their original web addresses or as archived elsewhere on the web. (See Facts - No on Prop 47 < http://www.votenoprop47.org/No_On_Prop_47__Facts.html> (as of Mar. 11, 2016); Californians Against Prop. 47 About Proposition 47, < https:// web.archive.org/web/20141010054701/http://californiansagainst47.com/about-proposition-47/>) (as of Mar. 11, 2016 [recapitulating criticism by California District Attorneys' Association (CDAA) ]; Proposition47_A_Cruel_Fraud.pdf: < http://www.co.mendocino.ca.us/da/pdf/Proposition47_A_Cruel_Fraud.pdf> (as of Mar. 11, 2016 [apparent copy of CDAA report]; D. Greenwald, Analysis: Perspectives on Proposition 47 (Oct. 29, 2014) Davis People's Vanguard < http://www.davisvanguard.org/2014/10/analysis-perspectives-on-proposition-47/> (as of Mar. 11, 2016 [quoting Judge J. Richard Couzens of the Placer County Superior Court]; Couzens, Prop. 47: a perspective from the bench (Oct. 28, 2014) Davis Enterprise < http://www.davisenterprise.com/forum/opinion-columns/prop-47-a-perspective-from-the-bench/> (as of Mar. 11, 2016) [apparent source of preceding]; Our Readers Say: Police, sheriffs say no to Prop 47 < http://www.redlandsdailyfacts.com/opinion/20141024/our-readers-say-police-sheriffs-say-no-to-prop-47> (as of Mar. 11, 2016) [letter from sheriffs and police chiefs: "Prop 47 would rewrite California law, including the Three Strikes Reform law, to give the term "unreasonable risk of danger to public safety" a very narrow definition."].)
Another, more visually striking page from the Californians Against 47 site also acknowledges the effect Proposition 47 would have on Proposition 36 cases. (Californians against Prop.47 No on Proposition 47 < http://wayback.archive-it.org/5903/20141031201441/http://californiansagainst47.com/> (as of Mar. 22, 2016.).)
At least one of the above pieces also appeared in a daily newspaper. (See < http://www.davisenterprise.com/print/?edition=2014-10-28 & ptitle=A6> (as of Mar. 11, 2016 [web facsimile of print page containing Couzens piece] ).) The Redland Daily News piece, or a version of it, also appeared on the website of the Highland Community News, and may therefore have appeared in that entity's newspaper as well. (San Bernardino County Police Chiefs and Sheriff's Association says: No on Prop 47 - Highland Community News: Opinion < http://www.highlandnews.net/opinion/san-bernardino-county-police-chiefs-and-sheriff-s-association-says/article_1d3fb9f8-5bc3-11e4-8c0f-47ac194ced49.html> (as of Mar. 11, 2016.).)
The foregoing are only the web-accessible sources thus far found which refer to the effect of section 1170.18(c)on Proposition 36 cases. Without vastly greater resources-and perhaps even with them-it is impossible to know what information may have been presented to voters through more traditional media such as broadcast advertising, flyers, and campaign mailers.

The page can no longer be found at its original web location, but a version archived on October 10, 2014, may be viewed at Californians Against Prop. 47 About Proposition 47 < https:// web.archive.org/web/20141010054701/http:// californiansagainst47.com/about-proposition-47/> (as of Mar. 11, 2016).

The CDAA paper is not available to nonmembers on CDAA's own website. Apparent copies, however, can be found at two other web addresses. (See Proposition 47: A Cruel Fraud < http://docplayer.net/1464582-Proposition-47-a-cruel-fraud.html> (as of Mar. 11, 2016); Proposition47_A_Cruel_Fraud.pdf < http://www.co.mendocino.ca.us/da/pdf/Proposition47_A_Cruel_Fraud.pdf> (as of Mar. 11, 2016).)